**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION LCA; THE CATHOLIC INSURANCE COMPANY; THE ROMAN CATHOLIC ARCHDIOCESE OF OKLAHOMA CITY; CATHOLIC CHARITIES OF THE ARCHDIOCESE OF OKLAHOMA CITY, INC.; ALL SAINTS CATHOLIC SCHOOL, INC.; ARCHBISHOP WILLIAM E. LORI, ROMAN CATHOLIC ARCHDIOCESE OF BALTIMORE AND HIS SUCCESSORS IN OFFICE; THE CATHEDRAL FOUNDATION, INC. d/b/a CATHOLIC REVIEW MEDIA; VILLA ST. FRANCIS CATHOLIC CARE CENTER, INC.; and GOOD WILL PUBLISHERS, INC. | ) | Civil Case No. 14-CV-00240-L |
| Plaintiffs, | ) | |
| v. | ) | |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; THOMAS E. PEREZ, Secretary of the United States Department of Labor; UNITED STATES DEPARTMENT OF LABOR; JACOB J. LEW, Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY | ) | |
| Defendants. | | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 1
A. The Mandate and the "Accommodation" .......... 2
B. The Mandate's Impact on the Plaintiff Employers .......... 6
C. The Mandate's Impact on the Association and the Insurance Company .......... 8
III. ARGUMENT .......... 10
A. Plaintiffs' Likely Success on the Merits .......... 10
1. RFRA Violated .......... 10
a. The Mandate Substantially Burdens Plaintiffs' Sincere Exercise of Religion .......... 11
(i) "Exercise of Religion" .......... 12
(ii) "Substantial Burden" .......... 13
*(a) Group III Members* .......... 13
*(b) Group II Members* .......... 13
*(c) Group I Members* .......... 14
*(d) The Association and the Insurance Company* .......... 14
b. The Mandate and Strict Scrutiny .......... 15
(i) No Compelling Interest .......... 15
(ii) Less Restrictive Means Available .......... 17
2. Establishment Clause Violated .......... 18
a. Anabaptists and HCSMs .......... 19
b. Three-Tiered Scheme of Religious Objectors .......... 21
c. Objecting TPAs .......... 23
B. Other Preliminary Injunction Factors Established .......... 24
IV. CONCLUSION .......... 24

# TABLE OF AUTHORITIES

Page

## CASES

*Abdulhaseeb v. Calbone*,
600 F.3d 1301 (10th Cir. 2010) ........ 11, 13

*Ave Maria Found. v. Sebelius*,
--- F. Supp. 2d ----, 2014 WL 117425 (E.D. Mich. 2014) ........ 13

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ........ 10, 19, 20, 24

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011) ........ 16

*Cate v. Oldham*,
707 F.2d 1176 (10th Cir. 1983) ........ 24

*Catholic Archdiocese of New York v. Sebelius*,
--- F. Supp. 2d ----, 2013 WL 6579764 (E.D.N.Y. 2013) ........ 14

*Catholic Diocese of Beaumont v. Sebelius*,
--- F. Supp. 2d ----, 2014 WL 31652 (E.D. Tex. 2014) ........ 13, 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 15, 16, 23

*Colorado Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ........ 19, 21

*East Texas Baptist Univ. v. Sebelius*,
--- F. Supp. 2d ----, 2013 WL 6838893 (S.D. Tex. 2013) ........ 13

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ........ 23

*Fisher v. Univ. of Tex. at Austin*,
133 S. Ct. 2411 (2013) ........ 18

*Geneva College v. Sebelius*,
--- F. Supp. 2d ----, 2013 WL 6835094 (W.D. Pa. 2013) ........ 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ........ 11, 17

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ........ 18

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ........ 11, 12, 13, 17, 24

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
132 S. Ct. 694 (2012) .......... 22

*Kikumura v. Hurley*,
242 F.3d 950 (10th Cir. 2001) .......... 11

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) .......... 12, 13

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 19, 20, 22

*Reaching Souls Int'l, Inc. v. Sebelius*,
No. CIV-13-1092-D, 2013 WL 6804259, at *8 (W.D. Okla. Dec. 20, 2013) .......... 13, 24

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) .......... 12

*Sherbert v. Verner*,
374 U.S. 398 (1963) .......... 10

*Southern Nazarene Univ. v. Sebelius*,
No. CIV-13-1015-F, 2013 WL 6804265, at *9 (W.D. Okla. Dec. 23, 2013) .......... 13

*Thomas v. Collins*,
323 U.S. 516 (1945) .......... 15

*Thomas v. Rev. Bd.*,
450 U.S. 707 (1981) .......... 15

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 624 (1994) .......... 15

*United States v. Lee*,
455 US 252 (1982) .......... 15

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 10, 15

*Zubik v. Sebelius*,
--- F. Supp. 2d ----, 2013 WL 6118696 (W.D. Pa. 2013) .......... 14

**RULES**

26 C.F.R. § 54.9815-2713A(a) .......... 4

26 C.F.R. § 54.9815-2713A(b)(2), (c)(2) .......... 5

26 C.F.R. § 54.9815-2713A(c)(2)(i)(B) .......... 5

26 C.F.R. § 54.9815-2713A(d) .......... 5

26 U.S.C. § 1402(g)(1)(E) ........ 19
26 U.S.C. § 4980D(b)(1), (e)(1) ........ 3
26 U.S.C. § 4980H(a), (c)(1) ........ 3
26 U.S.C. § 4980H(c)(2)(A) ........ 8, 17
26 U.S.C. § 5000A(d)(2)(A), (B) ........ 19
26 U.S.C. § 5000A(d)(2)(A), 1402(g)(1) ........ 17
26 U.S.C. § 5000A(d)(2)(B) ........ 8, 17, 20
26 U.S.C. § 6033(a)(3)(A)(i) ........ 22
26 U.S.C. § 6033(a)(3)(A)(i), (iii) ........ 22
26 U.S.C. §§ 5000A(d)(2)(A), 1402(g)(1) ........ 8
29 C.F.R. § 2510.3-16(b) ........ 5
29 C.F.R. § 2590.715-2713A(d) ........ 5
42 U.S.C. § 18011 ........ 8, 17
42 U.S.C. § 2000bb(b)(1) ........ 11
42 U.S.C. § 2000bb-1(b) ........ 10
42 U.S.C. § 300gg-13(a)(4) ........ 2
42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A) ........ 11
45 C.F.R. § 147.130(a)(1) ........ 20
45 C.F.R. § 147.131(a) ........ 22
45 C.F.R. § 147.140 ........ 17
45 C.F.R. §147.131(d) ........ 5

**TREATISES**

26 U.S.C. 6033(a)(3)(A)(i) ........ 21

**OTHER AUTHORITIES**

"Department of Health and Human Services," at 96, *in* Budget of the United States Government, Fiscal Year 2014, *available at* http://www.whitehouse.gov/ omb/budget/Overview (last visited Feb. 24, 2014) ........ 16

A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Feb. 24, 2014) ........ 16

Christian Care Ministry, Group Share for Churches & Christian Employers, http://mychristiancare.org/groups.aspx (last visited March 1, 2014) ........ 20

Christian Healthcare Ministries, Employers/self-employed, http://www.chministries.org/employers.aspx (last visited March 1, 2014) ................ 20

FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Feb. 25, 2014) .................................................................................................... 3

Health Res. Servs. Admin., Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited Feb. 25, 2014).......................... 3

Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (July 2011), at 75-76, *available for download at* http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Feb. 24, 2014)........................................................................... 18

## I. INTRODUCTION

Plaintiffs here are the Archdiocese of Oklahoma City; Catholic Charities of the Archdiocese of Oklahoma City, Inc. ("Catholic Charities"); All Saints Catholic School, Inc. ("All Saints"); Archbishop William E. Lori, Roman Catholic Archdiocese of Baltimore and His Successors in Office; The Cathedral Foundation, Inc. d/b/a Catholic Review Media; Villa St. Francis Catholic Care Center, Inc. ("Villa St. Francis"); and Good Will Publishers, Inc. ("Good Will Publishers"). These seven Plaintiffs are referred to as the "Plaintiff Employers." Other Plaintiffs are The Catholic Benefits Association LCA ("Association") and The Catholic Insurance Company ("Insurance Company"). All seek a preliminary injunction against rules (the "Mandate") burdening Plaintiffs' religious practices, coercing them to violate their sincere religious beliefs, and creating an unprecedented government scheme of discriminatory religious classifications.

The Archdiocese of Oklahoma City seeks a preliminary injunction for itself and all others similarly situated. Catholic Charities, All Saints, and Villa St. Francis seek a preliminary injunction for themselves and all others similarly situated. Good Will Publishers seeks a preliminary injunction for itself and all others similarly situated. The Association seeks a preliminary injunction for itself and all of its members. The Insurance Company seeks a preliminary injunction for itself, its insureds, and its contracting parties.

## II. BACKGROUND

Plaintiffs are Catholic institutions that adhere to the teachings of the Catholic Church on issues such as contraception, abortion, and sterilization. The Plaintiff

Employers sponsor or participate in health plans providing medical benefits to their employees. *See* Verified Complaint ("VC") ¶¶ 4,6.[1] They commit to provide no such benefits inconsistent with Catholic values. The Association and the Insurance Company exist to help Catholic employers provide morally compliant health benefits to their employees. The Association has, among its members, 1,000 parishes, plus almost 200 other Catholic employers, including the Plaintiff Employers. VC ¶ 90.

Defendants have promulgated a series of rules that force the Plaintiff Employers, under pain of crippling fines and other penalties, to pay for, provide, or arrange coverage in their health plans of contraceptives, abortion-inducing drugs and devices, sterilization, and related counseling ("CASC services"). Because their Catholic faith teaches that such services are immoral, the Plaintiffs Employers cannot comply with Defendants' Mandate without violating their sincerely held religious beliefs. VC ¶¶ 118-27. The Mandate also infringes the religious practices of the Association and the Insurance Company because the Mandate effectively bars their mission—enabling Catholic employer-members to provide morally compliant health plans. VC ¶¶ 80-106, 261-65.

### A. The Mandate and the "Accommodation"

The Mandate derives principally from 42 U.S.C. § 300gg-13(a)(4), a provision of the Affordable Care Act that requires certain employer health plans to cover "preventive care and screenings" for women. "Preventive care" includes "[a]ll FDA approved

[1] The Verified Complaint contains detailed factual allegations and legal citations important to this motion. It is incorporated into this motion, by reference, in its entirety.

contraceptive methods, sterilization procedures, and patient education and counseling."[2] Failure to provide such CASC coverage subjects an employer to fines of up to $36,500 per affected beneficiary per year. *See* 26 U.S.C. § 4980D(b)(1), (e)(1). If the employer fails to sponsor a health plan altogether, the fine is $2,000 per employee per year. *Id.* § 4980H(a), (c)(1).

The Mandate exempts what Defendants inaptly anaptly call "religious employers," defined as nonprofit organizations identified in 26 U.S.C. § 6033(a)(3)(A)(i) and (iii). *See* 45 C.F.R. § 147.131(a). This definition of "religious employer" is exiguously narrow. Its focus is "houses of worship." *See* 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). While Plaintiffs such as the Archdiocese of Oklahoma City are exempt under this provision, numerous other religious organizations, including Plaintiffs Catholic Charities, All Saints, and Villa St. Francis, are not. Religious for-profit employers like Plaintiff Good Will Publishers are also not exempt.

In response to a public outcry over Defendants' narrow definition of "religious employer," Defendants promised rulemaking that would "protect [non-exempt] religious organizations from having to *contract*, *arrange*, or pay for contraceptive coverage" as part of their health plans. 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012) (emphases

[2] Health Res. Servs. Admin., Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited Feb. 25, 2014). The "contraceptive methods" approved by the FDA include Plan B (the morning after pill), Ella (the week after pill), and the Copper IUD, which are known to be abortion-inducing in that they operate by "preventing attachment (implantation) to the womb (uterus)." *See* FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Feb. 25, 2014).

added). Defendants also promised that such coverage would be provided "independent of the objecting religious organization that sponsors the plan." *Id.* When Defendants finalized these rules in June 2013 (the "Final Rules"), both promises went unfulfilled.

The Final Rules' "accommodation" defined an "eligible organization," as one that (1) opposes providing CASC coverage on religious grounds, (2) is nonprofit, (3) "holds itself out as a religious organization," and (4) "self-certifies, in a form and manner specified by the Secretary, that it satisfies the [previous three] criteria." 26 C.F.R. § 54.9815-2713A(a).

This last requirement, self-certification, is fulfilled when the organization executes and delivers EBSA Form 700 ("Form") to its insurance provider or TPA. *See* **Exhibit A** (EBSA Form 700). The execution and delivery of the Form has numerous effects contrary to Catholic values. For employers of *self-funded plans,* this action amends the employer's plan to include, as a kind of second binder of coverage, the CASC services; makes the third party administrator ("TPA") the plan and claims administrator for those services; obligates the TPA to provide them and to give notice to the employees of their availability free of charge; subjects the TPA to penalties, fines, and damages if it fails to do so; gags the employer from communicating with the TPA about not providing the CASC services; and gives rise to scandal because the employer so blatantly acts contrary to the Catholic values it espouses. VC ¶¶ 200-217, 233-46 (and numerous statutes and regulations cited in therein).

For employers with *group insurance arrangements,* the execution and delivery of the Form to their health insurers also has effects contrary to Catholic values. This action

requires the insurer to provide CASC services, 78 Fed. Reg. at 39,876, 39,880; 26 C.F.R. § 54.9815-2713A(b)(2), (c)(2), obligates the insurer to give notice to the employees of their availability free of charge, 26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. §147.131(d), and gives rise to scandal because the employer so blatantly acts contrary to its Catholic values.

There is no separation between the CASC services employees receive and the health plan the organization sponsors. Employees' receipt of CASC services under the accommodation is directly tied to their enrollment in the plan, and employees receive the benefits only because they participate in the plan. *See id.* 26 C.F.R. § 54.9815-2713A(c)(2)(i)(B) (benefits last only "for so long as [employees] remain enrolled in the plan"); 78 Fed. Reg. at 39,880 (TPA must arrange separate payments "for participants and beneficiaries *in the plan*" (emphasis added)). In the case of self-insured plans, this is all the more clear because the government's Form serves as "an instrument under which the plan is operated" for purposes of the Employee Retirement Income Security Act (ERISA). 29 C.F.R. § 2510.3-16(b); *see also* 78 Fed. Reg. at 39,879. Upon delivery of the Form, the employer itself is "considered to comply with the contraceptive coverage requirement" of the Mandate. 78 Fed. Reg. at 39,879.

Nothing about the supposed accommodation relieves religious objectors of the requirement to "contract" or "arrange" for CASC coverage for their employees. Nor is coverage of CASC services "independent" of the organization or its plan. To the contrary, objecting employers continue to be the central cog in the government's scheme for the delivery of CASC services. The Mandate simply gives the religious organization

two options for satisfying the coverage requirement: the organization must either provide the benefits directly or, under the "accommodation," cause a surrogate to provide the benefits on its behalf. Either way, however, employees receive CASC services "*under* . . . the [employer's] plan," 78 Fed. Reg. at 39,879 (emphasis added), and the Mandate continues to compel the employer to "contract, arrange, or pay for contraceptive coverage," despite Defendants' promise to "protect" religious objectors from such a requirement. *See* 77 Fed. Reg. at 16,503.

**B. The Mandate's Impact on the Plaintiff Employers**

The net effect of Defendants' rulemaking over the past several years is a discriminatory classification scheme that singles out some religious organizations for exemption, offers others an empty "accommodation," and subjects religious for-profit businesses to the full force of the Mandate. The Association's Catholic employer-members fall into each of these groups, dubbed "Group I Members," "Group II Members," and "Group III Members," respectively. VC ¶ 89. These members' exercise of religion is substantially burdened by the Mandate because the Mandate coerces them, under the threat of crushing fines, to pay for, provide, or arrange for CASC coverage contrary to their Catholic faith. VC ¶¶ 231-60.

Group III Members, like Plaintiff Good Will Publishers, bear the full weight of the Mandate. VC ¶¶ 248-252. Good Will Publishers is a closely held for-profit business that publishes Bibles, Catholic literature, and other inspirational texts in the Judeo-Christian tradition. VC ¶¶ 58, 63. The devout faith of its Catholic owners infuses every aspect of the business, from the company's commitment to publish nothing inconsistent with

Catholic teachings, to the living wage it pays its employees, to the thousands of dollars it donates every year to Catholic organizations. Good Will Publishers is as much a ministry as a business. It defines success as not only increasing the bottom line, but also deepening customers' relationships with God and bettering employees' lives. Though it is incontestably a Catholic organization, VC ¶¶ 59-70, Defendants have offered Good Will Publishers neither exemption nor accommodation, and the Mandate requires Good Will Publishers' health plan to cover CASC services.

Group II Members of the Association, like Catholic Charities, All Saints, and Villa St. Francis, qualify as "eligible organizations," but Defendants' "accommodation" does not alleviate their religious objections. VC ¶¶ 200-17, 233-46. As explained on pages 4 and 5, *supra*, the Mandate requires Group II Members to violate their Catholic values in a variety of ways. Their sincerely held religious beliefs prevent this.

The Mandate also burdens Group I Members. VC ¶¶ 253-60. The Association's Group I Members includes dioceses and archdioceses, each of which sponsors a self-insured group health plan not only for its own employees, but also for employees of non-exempt affiliated ministries. They do this as part of their religious obligation to provide leadership for and support to other Catholic ministries. VC ¶¶ 254-56. For example, the Archdiocese of Oklahoma City sponsors a self-insured plan, and affiliated ministries, such as Catholic Charities and All Saints, participate in it. VC ¶ 258. These Group II participating employers, however, are not exempt. As a result, Group I Members are forced to sponsor plans that, due to participation by these non-exempt ministries, include coverage of CASC services, or to expel Group II employers from their plans. Either way,

Group I sponsors are unable to perform faith-commended service to and leadership for these ministries. This burdens Group I Members' religious practices and interferes in matters of internal religious governance. VC ¶ 257.

Even as the government imposes these burdens on the Plaintiff Employers, it has chosen not to enforce its Mandate on other employers and other health arrangements for both secular and religious reasons. Employers that provide "grandfathered" health plans, covering an estimated 98 million people, are entirely exempt from the Mandate. *See* 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,732 (July 19, 2010). Employers with fewer than fifty employees need not sponsor a group health plan at all, leaving an estimated 34 million American workers beyond the reach of the Mandate. See 26 U.S.C. § 4980H(c)(2)(A); The White House, The Affordable Care Act Increases Choice and Saving Money for Small Businesses, at 1, http://www.whitehouse.gov/files/documents/health_reform_for_small_businesses.pdf (last visited Feb. 24, 2014). Finally, some religious adherents are accorded special treatment under the Affordable Care Act and may create alternative health arrangements that make no provision for CASC services at all. *See* 26 U.S.C. §§ 5000A(d)(2)(A), 1402(g)(1) (Anabaptist exemption); *id.* § 5000A(d)(2)(B) (exemption for "health care sharing ministries"); *see also* VC ¶¶ 142-43. Defendants' refusal to grant similar exemptions to Group II and Group III Members, including Plaintiffs here, is irrational and discriminatory.

**C. The Mandate's Impact on the Association and the Insurance Company**

The Association is a Catholic nonprofit limited cooperative association, and the Insurance Company is a corporation. Both were organized in Oklahoma and were

established to enable Catholic employers around the country to provide morally compliant health benefits to their employees. VC ¶¶ 80, 96-97. Many state laws have contraceptive coverage requirements that apply to insurance providers, and now, of course, federal law imposes such a requirement directly on employers. *See* Nat'l Conference of State Legislatures, Insurance Coverage for Contraception Laws, http://www.ncsl.org/research/health/insurance-coverage-for-contraception-state-laws.aspx (last visited Mar. 1, 2014). Catholic employers who join the Association are eligible to create self-insured health plans and purchase stop-loss coverage from the Insurance Company. Such an arrangement will avoid state insurance mandates. It will not avoid the federal Mandate, however. Thus, the Association seeks relief for its present and future members, and the Insurance Company seeks relief for its present and future insureds, to enable the Association's regular and insured members to lawfully sponsor health plans that exclude CASC coverage.

The Archdiocese of Oklahoma City, Catholic Charities, All Saints, and Villa St. Francis currently maintain or participate in health plans that exclude coverage of CASC services. VC ¶ 24-27. The Mandate will take effect against these Plaintiffs when their plans renew this year (July 1, 2014, for the Archdiocese of Oklahoma City, Catholic Charities, and All Saints; and April 1, 2014, for Villa St. Francis). VC ¶¶ 26, 56. The Mandate has already taken effect against Good Will Publishers, whose health plan presently covers CASC services. VC ¶¶ 73-79. Many Association members plan to explore insurance arrangements with the Insurance Company to enable them to provide benefits consistent with their Catholic faith. VC ¶ 106. But the Mandate prohibits them

from doing so and threatens them with crippling fines, both now and in the future, for noncompliance. Plaintiffs thus seek a preliminary injunction enjoining enforcement of the Mandate.

## III. ARGUMENT

Plaintiffs are entitled to a preliminary injunction because (1) they are substantially likely to succeed on the merits, (2) they will suffer irreparable injury if the injunction is denied, (3) the threatened injury to Plaintiffs outweighs the injury Defendants will suffer under the injunction, and (4) the injunction is consistent with the public interest. *See Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

### A. Plaintiffs' Likely Success on the Merits

Plaintiffs are likely to succeed on the merits of their Religious Freedom Restoration Act ("RFRA") and Establishment Clause claims. Because these are adequate to afford complete relief, Plaintiffs do not now seek a preliminary injunction on their other claims.

**1. RFRA Violated.** Under RFRA, the government may not "substantially burden a person's exercise of religion" unless it shows that "application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). By "expressly adopt[ing] the compelling interest test 'as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972),'" RFRA restored strict scrutiny to free exercise claims. *Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (quoting 42 U.S.C. § 2000bb(b)(1)).

To make out a prima facie claim under RFRA, a plaintiff must prove a substantial burden on its sincere exercise of religion. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). The burden then shifts to the government "to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430-31. These burdens are the same at the preliminary injunction stage as they are at trial. *See id.* at 429; *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013).

**a. The Mandate Substantially Burdens Plaintiffs' Sincere Exercise of Religion.** RFRA defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). "[A] religious exercise need not be mandatory for it to be protected under RFRA." *Kikumura*, 242 F.3d at 960. A law "substantially burdens" the exercise of religion when it "(1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent . . . to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1138 (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010)) (internal quotation marks omitted). The Mandate does precisely that.

**(i)** ***"Exercise of Religion".*** Plaintiffs exercise religion when they choose, for religious reasons, to exclude coverage of CASC services from their group health plans. Catholic teaching on the sanctity of life and on contraception, abortion, and sterilization is familiar and well-documented, and the Association's members, including the Plaintiff Employers, adhere to those teachings. *See* VC ¶¶ 118-27. Their conscientious efforts to exclude coverage of CASC services from their health plans unquestionably qualify as the exercise of religion under RFRA. *See Hobby Lobby*, 723 F.3d at 1137-38 (recognizing as much); *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (same).[3]

Plaintiffs also exercise religion when, through the Association and the Insurance Company, they voluntarily associate to vindicate their shared interest in health coverage that complies with Catholic teachings and to ensure morally compliant health benefits for their members and employees. *See Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) (recognizing "a right to associate for the purpose of engaging in those activities protected by the First Amendment," including "the exercise of religion").

[3] That Good Will Publishers is a for-profit corporation does not preclude it from asserting a RFRA claim. *See Hobby Lobby*, 723 F.3d at 1137; *Korte*, 735 F.3d at 682. As noted above, Good Will Publishers' health plan is currently in compliance with the Mandate. Since promulgation of the Mandate, Good Will Publishers has actively sought ways to exclude coverage of CASC services. It has paid substantial additional premiums to acquire a policy that excludes surgical abortion. In 2013, the company's owners, Robert and Jacquelyn Gallagher, sent letters to the board and to employees outlining the company's moral objections to the Mandate and explaining that the company was diligently exploring alternatives. In January 2014, the Gallaghers joined an amicus brief supporting Hobby Lobby, whose challenge to the Mandate is now before the Supreme Court. Finally, Good Will Publishers (like many other Association members) anticipates becoming self-insured and purchasing stop-loss coverage from the Insurance Company. VC ¶¶ 70, 78-79.

**(ii)** ***"Substantial Burden".*** The Mandate substantially burdens Plaintiffs' exercise of religion because it puts Plaintiffs to a "Hobson's choice—an illusory choice where the only realistically possible course of action trenches on [Plaintiffs'] sincerely held religious belief[s]." *Abdulhaseeb*, 600 F.3d at 1315.

*(a) Group III Members*. For Group III Members like Good Will Publishers, the Tenth Circuit's *Hobby Lobby* decision is controlling: the Mandate imposes a substantial burden on Group III Members' religious practices. Since Group III Members are not eligible for either the exemption or the "accommodation" offered to nonprofit ministries, they bear the full weight of the Mandate. They must either directly subsidize health benefits they believe to be immoral, pay substantial fines for noncompliant plans, or drop their health plans altogether and still incur financial penalties. VC ¶¶ 248-52. This is a substantial burden. *Hobby Lobby*, 723 F.3d at 1141; *Korte*, 735 F.3d at 683-84.

*(b) Group II Members*. The substantial burden on Group II Members like Catholic Charities, All Saints, and Villa St. Francis is equally unmistakable, *see* pp.4-5, *supra*, and this Court has twice reached the same conclusion for identically situated plaintiffs. *See Southern Nazarene Univ. v. Sebelius*, No. CIV-13-1015-F, 2013 WL 6804265, at *9 (W.D. Okla. Dec. 23, 2013); *Reaching Souls Int'l, Inc. v. Sebelius*, No. CIV-13-1092-D, 2013 WL 6804259, at *8 (W.D. Okla. Dec. 20, 2013).[4] As already explained, the

[4] Numerous courts outside this District have also held that the "accommodation" violates RFRA for Group II employers. *See Ave Maria Found. v. Sebelius*, --- F. Supp. 2d ----, 2014 WL 117425, at *6 (E.D. Mich. 2014); *Catholic Diocese of Beaumont v. Sebelius*, --- F. Supp. 2d ----, 2014 WL 31652, at *8 (E.D. Tex. 2014); *East Texas Baptist Univ. v. Sebelius*, --- F. Supp. 2d ----, 2013 WL 6838893, at *23 (S.D. Tex. 2013); *Geneva College v. Sebelius*, --- F. Supp. 2d ----, 2013 WL 6835094, at *14 (W.D. Pa. 2013);

"accommodation" does not resolve Group II Members' religious objections to the Mandate because it makes them cooperate with evil.

*(c) Group I Members*. Group I Members like the Archdiocese of Oklahoma City are exempt from the Mandate, but the Mandate still burdens their religious practice. By requiring non-exempt employers to cover CASC services, the Mandate directly interferes with Group I Members' health arrangements, in which non-exempt employers (Group II Members) often participate. Group I Members are burdened because they must either sponsor health plans that include CASC coverage, expel the non-exempt ministries from their plans, or drop their plans altogether. VC ¶¶ 253-60. Courts have also recognized that this constitutes a substantial burden. *See Catholic Diocese of Beaumont*, 2014 WL 31652, at *8; *Zubik*, 2013 WL 6118696, at *23-27.

*(d) The Association and the Insurance Company*. The Association and the Insurance Company exist to enable Catholic employers to provide health coverage to their employees consistent with Catholic teachings. But the Mandate thwarts the religious purposes for which the Association, its members, and the Insurance Company came together, and makes it illegal or too costly to accomplish those purposes.

If the Plaintiff Employers maintain fidelity to their religious beliefs and provide health plans that exclude CASC coverage, they pay dearly: fines of up to $36,500 per affected beneficiary per year, plus potential penalties and civil lawsuits. To drop their

*Roman Catholic Archdiocese of New York v. Sebelius*, --- F. Supp. 2d ----, 2013 WL 6579764, at *15 (E.D.N.Y. 2013); *Zubik v. Sebelius*, --- F. Supp. 2d ----, 2013 WL 6118696, at *27 (W.D. Pa. 2013).

health insurance plans altogether, the Plaintiff Employers would pay fines of $2,000 per employee per year after the first thirty employees. The Supreme Court has found much less to constitute a cognizable burden on religious practice. *See Yoder*, 406 U.S. at 208 ($5 fine); *Thomas v. Review Bd.*, 450 U.S. 707, 717 (1981) (potential loss of unemployment benefits); *United States v. Lee,* 455 US 252, 254 (1982) ($27,000 in employment taxes).

**b. The Mandate and Strict Scrutiny.** Because the Mandate substantially burdens Plaintiffs' religious practices, it must satisfy strict scrutiny. It cannot do so. The government's interest in the widespread availability of contraception cannot be compelling when Defendants have exempted millions of plans, covering tens of millions of employees, from the Mandate. VC ¶¶ 146, 148. And the government has far less intrusive means at its disposal for addressing this supposed problem.

**(i)** ***No Compelling Interest.*** To prevail in this case, Defendants must demonstrate that the Mandate furthers interests "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Under this test, "[o]nly the gravest abuses, endangering paramount interests," justify restrictions on Plaintiffs' religious practices. *See Thomas v. Collins*, 323 U.S. 516, 530 (1945). This is not an abstract inquiry. Rather, Defendants must show that the harms sought to be addressed by the Mandate "are real, not merely conjectural," and that the Mandate "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 624, 664 (1994). When a law is substantially underinclusive with respect to the interest asserted, the interest asserted is not compelling, for "a law cannot be

regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *O Centro*, 546 U.S. at 433 (quoting *Lukumi*, 508 U.S. at 547) (internal quotation marks omitted).

Defendants claim the Mandate serves to increase access to contraceptives, which in turn advances women's health and helps ensure the equality of women in the workplace. *See* 77 Fed. Reg. 8725, 8727-28 (Feb. 15, 2012). In the first place, this is hardly a "compelling" problem in need of a solution. As Defendants acknowledge, contraceptives are widely available at non-prohibitive costs, and they are "the most commonly taken drug in America by young and middle-aged women." A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Feb. 24, 2014). Through its Title X program, HHS maintains an extensive funding network geared toward increasing contraceptive access and education. *See* "Department of Health and Human Services," at 96, *in* Budget of the United States Government, Fiscal Year 2014, *available at* http://www.whitehouse.gov/omb/budget/Overview (last visited Feb. 24, 2014) (requesting $327 million in Title X funds for fiscal year 2014). And even before the Mandate was promulgated, contraceptives were covered by "over 85 percent of employer-sponsored health insurance plans." 75 Fed. Reg. 41,726, 41,732 (July 19, 2010). The Mandate merely fills a "modest gap" in contraceptive coverage—hardly a compelling interest. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2741 (2011).

Yet even if Defendants' asserted interests were compelling in the abstract, they cannot be compelling in the context of the Mandate. By Defendants' own estimates, the

Affordable Care Act exempts millions of plans, covering tens of millions of employees, from the Mandate through both the "grandfathering" exemption, *see* 42 U.S.C. § 18011; 45 C.F.R. § 147.140, and the exemption for small businesses, *see* 26 U.S.C. § 4980H(c)(2)(A). Defendants have also chosen not to impose their Mandate on health arrangements created by select religious groups as alternatives to insurance coverage. *See* 26 U.S.C. § 5000A(d)(2)(A), 1402(g)(1) (Anabaptist exemption); *id.* 26 U.S.C. § 5000A(d)(2)(B) (exemption for "health care sharing ministries"). RFRA requires Defendants to show they have a compelling interest in requiring *these particular Plaintiffs* to provide CASC services to their employees. *See O Centro*, 546 U.S. at 430-31. Defendants cannot make that showing when they have elected not to mandate CASC coverage for millions of American workers for both secular and religious reasons. *See Hobby Lobby*, 723 F.3d at 1143-44.

**(ii)** ***Less Restrictive Means Available.*** Even assuming that widespread availability of free contraceptive coverage is a compelling interest, Defendants have not chosen the least restrictive means of advancing it. Defendants have numerous other means at their disposal for broadening access to CASC services. The government could (1) directly provide coverage of CASC services for individuals who do not currently receive such benefits through their health plans; (2) reimburse those who pay out of pocket for CASC services through a combination of direct subsidies, tax deductions, and tax credits; (3) facilitate greater access to CASC services through the health insurance exchanges; or (4) work with other, willing organizations to expand access to CASC

services. Each of these would advance the government's goals without burdening Plaintiffs' religious exercise.

In promulgating the Mandate, Defendants neither evaluated the feasibility of these alternatives nor explained why they were unworkable. Indeed, Defendants outsourced the task of deciding whether to mandate CASC coverage to a non-governmental body, the Institute of Medicine ("IOM"), whose report bluntly acknowledged the limitations of its analysis. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (July 2011), at 75-76, *available for download at* http://www.iom.edu/Reports/2011/ Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Feb. 24, 2014) (noting that review focused only on "clinical efficacy" of CASC services and had not considered "a host of other issues," including "availability; ethical, legal, and social issues; and availability of alternatives"). In adopting IOM's recommendations, Defendants never explained how the Mandate accounts for and resolves the issues that IOM declined to consider. Such regulatory nonfeasance cannot meet RFRA's exacting standard and is fatal to the Mandate. *See Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2420 (2013) (strict scrutiny requires the government to engage in "serious, good faith consideration of workable . . . alternatives" and to show that none of those alternatives would advance the government's interest to a similar degree (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)) (internal quotation marks omitted)).

For all these reasons, Plaintiffs are likely to prevail on their RFRA claim.

**2. Establishment Clause Violated.** "From the beginning, this nation's conception of religious liberty included, at a minimum, the equal treatment of all

religious faiths without discrimination or preference." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008). Neutral treatment of religious groups is "[t]he clearest command of the Establishment Clause." *Id*. (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)) (internal quotation marks omitted). A law violates the Establishment Clause when it deliberately discriminates among religions, *Awad*, 670 F.3d at 1128, or when it draws "distinctions between different religious organizations," even on the basis of ostensibly neutral criteria, *see Colo. Christian Univ.*, 534 F.3d at 1259 (quoting *Larson*, 456 U.S. at 244) (internal quotation marks omitted). The Mandate fails in both respects. Indeed, we can identify no law with as elaborate a classification scheme, creating religious winners and losers, as the Affordable Care Act. The Act's scheme makes the quantum of government-permitted religious freedom depend upon which of these six religious classes or their respective subclasses fit a person or entity: (1) Anabaptist, (2) health care sharing ministry ("HCSM"), (3) "religious employer," (4) "eligible organization," (5) religious for-profit employer, or (6) objecting TPA.

**a. Anabaptists and HCSMs.** Members of historic Anabaptist congregations and members of HCSMs are exempt from the individual mandate. *See* 26 U.S.C. § 5000A(d)(2)(A), (B). Anabaptists include Mennonites, Amish, Hutterites, and Bruderhof. VC ¶ 143. There are only three HCSMs—Samaritan Ministries, Medi-Share, and Christian Healthcare Ministries—and each is Evangelical Protestant. VC ¶ 141. The government closed this exemption to other religious groups by limiting the Anabaptist exemption to sects in existence since December 31, 1950, 26 U.S.C. § 1402(g)(1)(E), and by limiting the HCSM exemption to groups in existence since December 31, 1999, *id.*



2004680311_2

§ 5000A(d)(2)(B). A law distinguishing between older and newer religious groups violates the Establishment Clause. *Larson*, 456 U.S. at 1684, n.23.

While these exemptions apply to the individual mandate, they cannot be walled off from the CASC Mandate for two reasons. First, they permit alternative health arrangements excluding CASC coverage and limit them to select religious individuals. Catholics do not fit the Anabaptist exemption, and they cannot form HCSMs. Second, the availability of these alternate health arrangements gives Anabaptist and Evangelical Protestant employers a *viable moral option for avoiding the Mandate*. Such employers may drop their health plans altogether, advise their employees to access the available alternate arrangements, and even subsidize their health care in these arrangements. In this way, employees are cared for, and the Mandate's objectionable requirements are avoided.[5] Catholic employers, like the Plaintiff Employers, do not have this option. If the Plaintiff Employers dropped their health plans, they would drive their employees to the exchanges where all plans cover CASC services. *See* 45 C.F.R. § 147.130(a)(1).

There is no reason for the government to favor Anabaptists and Evangelical Protestants over Catholics in this way. As explicit preferences for two religious groups over others, the Anabaptist and HCSM exemptions violate the Establishment Clause. *See Larson*, 456 U.S. at 244; *Awad*, 670 F.3d at 1128.

[5] This is not hypothetical. The HCSMs market themselves to Christian businesses and ministries in addition to individuals. *See* Christian Care Ministry, Group Share for Churches & Christian Employers, http://mychristiancare.org/groups.aspx (last visited March 1, 2014); Christian Healthcare Ministries, Employers/self-employed, http://www.chministries.org/employers.aspx (last visited March 1, 2014).

**b. Three-Tiered Scheme of Religious Objectors.** The government deems some employers "religious" and exempts them from the Mandate. 45 C.F.R. § 147.131(a). These are the biggest religious "winners." They include churches, their integrated auxiliaries, conventions of churches, and exclusively religious activities of religious orders, 26 U.S.C. § 6033(a)(3)(A)(i), (iii)—a group that describes the Association's Group I Members. Group II Members, by contrast, are simply tossed a second-class "accommodation." Group III Members get nothing.

Defendants justify favoring Group I Members over Group II Members by reasoning that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39,874. By using uniformity or intensity of employees' religious beliefs as a basis for discrimination, Defendants have transgressed the Establishment Clause. This was the precise issue in *Colorado Christian University*, where the Tenth Circuit invalidated a state law that denied government benefits to students that attended religious colleges deemed "pervasively sectarian," defined in part by whether students, faculty, and trustees shared the same "religious persuasion." *See* 534 F.3d at 1250-51. The Mandate's attempt to draw a similar line is likewise invalid. The Establishment Clause prohibits government discrimination "based on the degree of religiosity of [an] institution and the extent to which that religiosity affects its operations." *Id.* at 1259. Moreover, whether to employ persons of the same faith or

intensity of faith is an "internal . . . decision" affecting a religious organization's "faith and mission"—matters the Establishment Clause places beyond the government's purview. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 707 (2012).

Even within the government's class of "religious employers," there are subclasses constituting further discrimination between types of religious groups. When a Group I Member separately incorporates a high school or a Catholic Charities instead of performing such ministry as an unincorporated operating division, that ministry drops from the most favored "religious employer" class to the "eligible organization" class.[6] This burdens the Group I Member's decision to opt for separate corporate status for significant ministries. Further, "integrated auxiliaries" enjoy most favored "religious employer" status, 45 C.F.R. § 147.131(a); 26 U.S.C. § 6033(a)(3)(A)(i), but only if they are "internally supported," meaning that less than 50% of their support comes from outside sources, 26 C.F.R. § 1.6033-2(h)(4). This is the very sort of religious classification *Larson* struck down. *See* 456 U.S. at 247 & n.23 ("fifty per cent rule of [the challenged statute] clearly grants denominational preferences of the sort . . . firmly deprecated in our precedents.").

Finally, there are the Group III Members—religious for-profit employers—who are offered no exemption or "accommodation" for their religious beliefs. Yet even

---

[6] 45 C.F.R. § 147.131(a) (separately incorporated ministries other than "churches, their integrated auxiliaries, and conventions or associations of churches" or "religious activities of religious orders" as described in 26 U.S.C. § 6033(a)(3)(A)(i), (iii) do not qualify for "religious employer" exemption); *see also* 77 Fed. Reg. at 16,502.

among these organizations, the government discriminates. Defendants have said that religious *sole proprietorships* and religious *general partnerships* opposed to the Mandate have standing to invoke RFRA's protection, while religious *limited partnerships* and *corporations* do not. *See* **Exhibit B** (excerpt from transcript of oral argument in *Hobby Lobby*, 723 F.3d 1114).

**c. Objecting TPAs.** Under the Final Rules, a TPA that receives an eligible organization's self-certification form has "no obligation" to provide or arrange for the payment of CASC services if it "objects to any of these responsibilities." 78 Fed. Reg. at 39,880. Defendants have not limited the grounds on which a TPA may so object. A TPA may therefore object on *religious or secular grounds* and be relieved of its obligation to provide or arrange for CASC coverage. Yet Plaintiffs, with ardent religious objections to the same obligation, have no such option. Here again, Defendants have discriminated against Plaintiffs in violation of the Establishment Clause. The government may not prefer some religious objections over others, nor may it prefer secular objections over religious ones. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."); *cf. Lukumi*, 508 U.S. at 537-38 (religious practice is "singled out for discriminatory treatment" when government "devalues religious reasons" for behavior and deems them to be "of lesser import than nonreligious reasons").

For these reasons, Plaintiffs will likely prevail on the Establishment Clause claim.

**B. Other Preliminary Injunction Factors Established**

To find the remaining preliminary injunction factors satisfied, this Court need not tread new ground. It is settled law in this Circuit that "a likely RFRA violation satisfies the irreparable harm factor." *Hobby Lobby*, 723 F.3d at 1146. The same is true of violations of the Establishment Clause. *See Awad*, 670 F.3d at 1131. The balance of harms clearly favors Plaintiffs because, while the Mandate threatens Plaintiffs with catastrophic fines and penalties for noncompliance, "the government has already exempted health plans covering millions of others." *Hobby Lobby*, 723 F.3d at 1146. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights," and "[b]ecause [Plaintiffs] have demonstrated a likely violation of their RFRA rights, an injunction would be in the public interest." *Id.* at 1147; *see also Awad*, 670 F.3d at 1132 (enjoining Establishment Clause violation because of "[t]he strong public interest in protecting First Amendment values" (quoting *Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983)) (internal quotation marks omitted)). *Hobby Lobby* drew these conclusions in the context of for-profit employers, and this Court followed *Hobby Lobby* in twice holding that nonprofit ministries were entitled to a preliminary injunction. *See S. Nazarene Univ.*, 2013 WL 6804265, at *10; *Reaching Souls*, 2013 WL 6804259, at *8. The same conclusions are warranted in this case.

## IV. <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request the Court to enter the preliminary injunction as described in Plaintiff's Motion for Preliminary Injunction filed this day.

DATED: March 12, 2014.

Respectfully submitted,

*s/ J. Angela Ables*
J. Angela Ables (Okla. Bar #0112)_
Johnny R. Blassingame (Okla. Bar #21110)
KERR, IRVINE, RHODES & ABLES, P.C.
201 Robert S. Kerr Ave., Suite 600
Oklahoma City, Oklahoma 73102
o:405-272-9221; f:405-236-3121
aables@kiralaw.com
jblassingame@kiralaw.com

L. Martin Nussbaum (Colo. Bar #15370)
Ian S. Speir (Colo. Bar #45777)
Eric Kniffin (D.C. Bar #999473)
LEWIS ROCA ROTHGERBER LLP
90 S. Cascade Ave., Suite 1100
Colorado Springs, CO 80920
o:719-386-3000; f:719-386-3070
mnussbaum@lrrlaw.com
ispeir@lrrlaw.com
ekniffin@lrrlaw.com
(*Pro Hac Vice Motions Pending)*

**ATTORNEYS FOR PLAINTIFFS**

sdg

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of March, 2014, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

I further certify that on the 12th day of March, 2014, a copy of the attached document was served on the following by certified mail, restricted delivery, return receipt requested:

Kathleen Sebelius, Secretary of the United States
Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201-0004

United States Department of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201-0004

Thomas E. Perez, Secretary of the United States Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

United States Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

Jacob J. Lew, Secretary of the United States Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

United States Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

*s/ J. Angela Ables*
J. Angela Ables