## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **THE CATHOLIC BENEFITS**<br>**ASSOCIATION LCA,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**KATHLEEN SEBELIUS, in her official**<br>**capacity as Secretary, United States**<br>**Department of Health and Human**<br>**Services,** *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Case No. CIV-14-240-R** |

## ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction. Doc. No. 4. Defendants have filed their response to this motion, and Plaintiffs have filed their reply to Defendants' response. The American Civil Liberties Union has also filed an amicus brief opposing Plaintiffs' motion. On May 8, 2014, the Court heard oral argument pertaining to the issues raised by the parties' briefs. Following oral argument, the Court granted Defendants time in which to file a supplemental brief concerning a particular issue that was raised by Plaintiffs for the first time in their reply brief. Having considered all of the above, as well as the relevant legal authority that is developing across the country, Plaintiffs' motion is DENIED in part, and GRANTED in part.

This motion stems from an action challenging a provision of the Affordable Care Act (ACA)[1] and the regulations issued under it, which mandate that certain employers

---

[1] The ACA is comprised of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

provide health coverage for contraceptives to their employees, or face crippling fines for failing to do so. Plaintiffs are a number of entities that readily identify with the Catholic Church and adhere to its teachings, and they assert that the contraceptive mandate violates their sincerely held religious beliefs. Plaintiffs have brought this action against Kathleen Sebelius, Secretary of the United States Department of Health and Human Services,[2] along with other government officials and agencies, advancing a number of statutory and constitutional challenges to the contraceptive mandate. In the present motion, Plaintiffs seek a preliminary injunction against Defendants' collective ability to enforce the contraceptive mandate against them, basing their motion upon the Religious Freedom Restoration Act (RFRA) and the Establishment Clause. Plaintiffs also seek preliminary injunctive relief extending beyond the named parties in order to protect a putative class of similarly situated entities.

## I. Background

Plaintiffs are The Catholic Benefits Association LCA (CBA), The Catholic Insurance Company (CIC), The Roman Catholic Archdiocese of Oklahoma City (Archdiocese of Oklahoma City), Catholic Charities of the Archdiocese of Oklahoma City, Inc. (Catholic Charities), All Saints Catholic School, Inc. (All Saints), Archbishop William E. Lori, Roman Catholic Archdiocese of Baltimore and His Successors in Office (Archdiocese of Baltimore), The Cathedral Foundation, Inc. d/b/a/ Catholic Review Media (Catholic Review Media), Villa St. Francis Catholic Care Center, Inc. (Villa St.

---

[2] While Kathleen Sebelius has resigned as Secretary of the Department of Health and Human Services, her substitute has not yet been named. The Court will substitute the successor as a defendant once the successor has been named. *See* Fed. R. Civ. P. 25(d).

Francis), and Good Will Publishers, Inc. (Good Will Publishers). Plaintiffs are heavily associated with the Catholic Church, and they adhere to Catholic teachings regarding contraception, abortion, and sterilization, which counsel against the use of any artificial interference with the creation and nurture of new life. Therefore, Plaintiffs all religiously object to contraception, abortion-inducing drugs and devices, surgical abortion, sterilization, and related counseling.

Under 42 U.S.C. § 300gg-13(a)(4), certain employer health plans must cover "preventive care and screenings" for women. Based upon the guidelines adopted by the Health Resources and Services Administration, "preventive care" includes "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."[3] Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines (last visited June 3, 2014). If an employer subject to the contraceptive mandate fails to provide the required contraceptive coverage in its health plan, then the employer faces fines of $100 per day per employee, or in other words, up to $36,500 per year per employee. *See* 26 U.S.C. § 4980D(b)(1). Further, if the employer fails to provide any health plan whatsoever to its employees, the employer faces fines of $2,000 per year per full time employee (less 30 employees). *Id.* § 4980H(a), (c)(1).

---

[3] FDA-approved contraceptive methods include the so-called morning after pill, also known as Plan B, the so-called week after pill, also known as Ella, and intra uterine devices. *See* Food & Drug Administration, "Birth Control: Medicines to Help You," www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm (last visited June 3, 2014).

The regulations issued under the contraceptive mandate operate to exempt certain employers, as well as provide an accommodation for other non-exempt employers. Under 45 C.F.R. § 147.131(a), "religious employers" are exempted from the contraceptive mandate. For purposes of the regulations, "religious employer" is narrowly defined as a nonprofit entity referred to in 26 U.S.C. § 6033(a)(3)(A)(i) or (iii). *See* 45 C.F.R. § 147.131(a); 78 Fed. Reg. 39,870, 39,874. The groups referred to in 26 U.S.C. § 6033(a)(3)(A)(i) and (iii) include "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order."

The regulations further provide for an accommodation for certain non-exempt employers who do not want to provide coverage for the required contraceptive services based upon religious objections. A non-exempt employer is eligible for this so-called accommodation if it satisfies the following requirements: (1) it opposes providing coverage for some or all of the required contraceptive services due to religious objections; (2) it is a nonprofit entity; (3) it "holds itself out as a religious organization;" and (4) it "self-certifies, in a form and manner specified by the Secretaries of Health and Human Services and Labor, that it satisfies the [previous three] criteria." 26 C.F.R. § 54.9815-2713A(a); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R. § 147.131(b); 78 Fed. Reg. at 39,874.

In order to meet this last requirement, self-certification, an employer must execute and deliver EBSA Form 700 to its issuer, or if the employer has a self-insured health plan, to its third-party administrator (TPA). 26 C.F.R. § 54.9815-2713A(b)-(c); 29 C.F.R.

§ 2590.715-2713A(b)-(c); 45 C.F.R. § 147.131(c); 78 Fed. Reg. at 39,878-79. If a nonprofit religious employer executes and delivers EBSA Form 700 to its issuer or TPA, the issuer or TPA must then provide notice to the employer's employees of the availability of contraceptive services free of charge, as well as provide contraceptive services to these employees. 26 C.F.R. § 54.9815-2713A(b)-(d); 29 C.F.R. § 2590.715-2713A(b)-(d); 45 C.F.R. § 147.131(c)-(d); 78 Fed. Reg. at 39,878-80.

Based upon the differences in their characteristics, as well as the way the exemption and the accommodation work, Plaintiffs in this case can be divided into several groups. First, both the CBA and the CIC are not directly regulated by the contraceptive mandate. The CBA is an Oklahoma nonprofit limited cooperative association, which was organized in relevant part to assist Catholic employers in providing health benefits to their respective employees in a manner consistent with Catholic values. The CBA incorporated the CIC, an Oklahoma for-profit insurance company, whose purpose is to provide stop loss insurance to members of the CBA in a manner consistent with Catholic values.

The remaining Plaintiffs are employers that are members of the CBA. These Plaintiffs all either sponsor or participate in health plans that provide medical benefits to their employees, and with one exception,[4] none of their health plans provide coverage for any contraceptive services. Certain Plaintiffs, classified by the Court as Group I Plaintiffs, meet the "religious employer" definition in the regulations and are exempted

---

[4] Good Will Publishers' health plan currently provides coverage for certain contraceptive services. This is for two reasons: (1) the state in which Good Will Publishers is incorporated, North Carolina, separately requires employer health plans to cover certain contraceptives; and (2) the contraceptive mandate in the ACA has already taken effect against Good Will Publishers.

from the contraceptive mandate. The Group I Plaintiffs include the Archdiocese of Oklahoma City and the Archdiocese of Baltimore.[5] Other Plaintiffs, classified by the Court as Group II Plaintiffs, qualify for the accommodation as nonprofit religious organizations that object to providing coverage for contraceptive services in their health plans based upon their religious views. The Group II Plaintiffs include Catholic Charities, All Saints, Catholic Review Media, and Villa St. Francis. Finally, Good Will Publishers, classified by the Court as the Group III Plaintiff, is a for-profit corporation, and it neither fits into the exemption nor qualifies for the accommodation.

Plaintiffs collectively assert that the Court should enter a preliminary injunction in this case, because the challenged provisions of the ACA violate their rights under RFRA and the Establishment Clause. In response, Defendants argue that a preliminary injunction in this case would be improper both because certain Plaintiffs lack constitutional standing, and also because Plaintiffs cannot establish the various requirements for obtaining a preliminary injunction.

## II. Standing

Defendants first assert that three of the Plaintiffs—Good Will Publishers, the CBA, and the CIC—lack constitutional standing. "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[A] plaintiff must show an injury that is [1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable

---

[5] As part of their religious beliefs, these Group I Plaintiffs provide self-insured health plans for employers located in the regions of the country to which they minister, and other Plaintiffs in this case participate in these health plans. Namely, Catholic Charities and All Saints participate in the Archdiocese of Oklahoma City's self-insured health plan, and Catholic Review Media participates in the Archdiocese of Baltimore's self-insured health plan.

by a favorable ruling." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (quotation omitted) (internal quotation marks omitted).

Defendants argue that Good Will Publishers lacks standing due to its inability to show that a favorable ruling would redress its purported injury, as it is governed by a separate North Carolina law that requires its health plan to cover certain contraceptives. But the Court disagrees. Standing doctrine does not require "complete redressability." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (citation omitted). In other words, "a plaintiff need show only that a favorable decision would redress '*an* injury,' not '*every* injury.'" *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

Here, the challenged federal law requires that Good Will Publishers' health plan provide coverage for emergency contraception, such as Plan B and Ella, whereas the North Carolina law appears that it does not require such coverage. *See* N.C. Gen. Stat. § 58-3-178(c)(4); Guttmacher Institute, "State Policies in Brief: Emergency Contraception" (updated June 1, 2014), www.guttmacher.org/statecenter/spibs/spib_EC.pdf (last visited June 3, 2014) (indicating in a chart that North Carolina law excludes emergency contraception from its contraceptive coverage mandate). Because the federal law is thus more onerous than the state law, and because Catholic teaching condemns emergency contraception in stronger terms than it does other forms of contraception, *See* Doc. No. 1, at 30; Doc. No. 48, at 9 n.1, a favorable ruling in this case would redress an injury to Good Will Publishers that it does not face under the North Carolina law. That is, a favorable decision would relieve Good Will Publishers' problem to some extent, and this

is all that the law requires. *See King*, 678 F.3d at 903 (citing *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007)). Accordingly, Good Will Publishers has standing to sue in this case.[6]

Next, Defendants argue that the CBA lacks associational standing to sue on behalf of its members. "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (citation omitted). The Supreme Court has determined that an association possesses standing to sue on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, the first two prongs of the *Hunt* test are clearly met,[7] and Defendants essentially concede this by only challenging whether the CBA meets the third prong of this test. Concerning the third prong of the *Hunt* test, Defendants rely heavily on *Harris v. McRae*, 448 U.S. 297, 321 (1980), in arguing that a RFRA claim requires individual participation. Similarly, Defendants contend that "the availability of preliminary

---

[6] Defendants concede that if Good Will Publishers has constitutional standing, then the Court is bound by the Tenth Circuit's decision in *Hobby Lobby* in finding that it is likely to succeed on its RFRA claim. *See* Doc. No. 29, at 21 n.8. In accordance with the Court's analysis concerning the remaining requirements for obtaining a preliminary injunction, the Court will find that Good Will Publishers is entitled to preliminary injunctive relief.

[7] Defendants have only challenged whether one of the CBA's named members in this suit, Good Will Publishers, has standing. And the Court has already determined that Good Will Publishers does have standing to sue in this case. Moreover, the interests that the CBA is seeking to protect are germane to the organization's purpose. Contraceptives violate Catholic teachings, the CBA was organized for the express purpose of supporting Catholic employers in providing health benefits to their employees in a manner consistent with Catholic teachings, and the CBA is seeking to challenge a law requiring its members' health plans to provide coverage for contraceptive services.

injunctive relief on any claim turns on questions of irreparable harm, the balance of equities, and the public interest, . . . all of which may very well vary from employer to employer and circumstance to circumstance." Doc. No. 29, at 20.

Notwithstanding Defendants' arguments, the Court finds that the CBA possesses associational standing to pursue its members' claims. To begin with, Defendants' argument that *Harris* dictates that all RFRA claims require individual participation is unpersuasive. In *Harris*, the organization seeking to establish associational standing conceded to the Supreme Court that its membership held a diversity of religious views concerning what was at stake in the case. *See* 448 U.S. at 320-21. And this diversity of views no doubt impacted the Supreme Court's determination that the participation of the individual members of the organization was required in order to properly resolve their diverging free exercise claims. *See id.* at 321.

It follows that the basis for associational standing was much more tenuous in *Harris* than the basis for it in this case. Here, it is abundantly clear that all of the CBA's members abide by Catholic conviction that contraceptives violate their conscience, and Defendants do not contend otherwise. Because the CBA's members are so uniform in their beliefs—particularly their beliefs that contraceptives are objectionable—the Court finds that the CBA can properly present its members' claims in this case such that the participation of the individual members of the CBA is not required.

Additionally, Defendants' argument that the preliminary injunction factors prohibit associational standing is unavailing, as it contradicts Supreme Court precedent. The CBA is seeking an injunction on its members' behalf, and this is the type of relief

where "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515. This means that the type of relief requested does not require the participation of individual members. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) ("Relying on *Warth* . . . , *Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members . . . ."). Therefore, the Court finds that the CBA possesses associational standing to sue in this case.

Finally, Defendants assert that the CIC lacks standing because the challenged regulations do not apply to the CIC.[8] Plaintiffs acknowledge that the challenged regulations do not specifically apply to the CIC. But Plaintiffs still argue that the CIC has standing in this case, because the challenged regulations apply to entities with which the CIC contracts, and the regulations negatively affect these entities. Plaintiffs cite several cases in support of their position, including *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 422-23 (1942), and *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925).

In spite of Plaintiffs' arguments, the Court finds that the CIC does not have standing in this case. While it is true that standing is not precluded when a plaintiff challenges government action that does not directly regulate that plaintiff, establishing standing in this scenario is "substantially more difficult." *See Lujan*, 504 U.S. at 562 (citations omitted). With this in mind, there is no question that the challenged provisions

---

[8] In their response brief, Defendants made several arguments concerning the CIC's third-party or associational standing. But in reply, Plaintiffs asserted that the CIC only seeks standing in its own right. Thus, the Court will focus upon whether the CIC itself possesses standing to sue.

of the ACA do not regulate the CIC, but instead regulate entities with which the CIC does business. Of particular importance to the Court, the regulated entities with which the CIC contracts—that is, the members of the CBA—are also a part of this suit. Therefore, there is no need for the CIC to be a part of this suit. At oral argument, Plaintiffs even conceded that if the Court were to grant relief to the Group II Plaintiffs (and presumably the Group III Plaintiff as well), "[i]t would take care of a lot of [the CIC's] problem."

Additionally, the Court fails to see how the CIC's alleged injury—that the challenged regulations prevent it from doing the business for which it was formed—could possibly be redressed by a favorable ruling for the CIC. Indeed, Plaintiffs' statements at oral argument compound the Court's confusion. In answering the Court's question regarding what relief would be afforded the CIC by a favorable ruling, Plaintiffs stated that part of the relief they sought "is that the parties that . . . enter contractual relationships with [the CIC] need to know that they're not risking their character as a lawful actor by doing business with [the CIC]." The Court finds it entirely too speculative that any favorable ruling for the CIC would accomplish this.[9] *See Lujan*, 504 U.S. at 561. For these reasons, the CIC does not have standing to sue in this case.

Having decided that both Good Will Publishers and the CBA possess standing to sue in this case, and that the CIC lacks standing to sue in this case, the Court next turns to Plaintiffs' request for preliminary injunction.

---

[9] Indeed, if the Court enjoined Defendants from enforcing the challenged provisions of the ACA against the CIC (even though these provisions do not apply to the CIC in the first place), then this would not prohibit Defendants from enforcing the challenged provisions of the ACA against the customers of the CIC that are directly regulated by these challenged provisions. Based upon Plaintiffs' request for relief, it appears that the CIC is nothing more than a "concerned bystander" attempting to vindicate its value interests, and this is improper. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013).

## III. Preliminary Injunction

In order to prevail on their Motion for Preliminary Injunction, Plaintiffs must show: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant[s]; (3) the harm alleged by the movant[s] outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby*, 723 F.3d at 1128 (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). Plaintiffs have sought a preliminary injunction based upon their claims under both RFRA and the Establishment Clause, and the Court will address their likelihood of success on the merits for both of these claims in turn.

## A. Likelihood of Success on the Merits under RFRA

Under RFRA, the federal government is prohibited from substantially burdening a person's exercise of religion, unless the government can demonstrate "that the application of the burden to the person is the least restrictive means of furthering a compelling governmental interest." *Reaching Souls Intern., Inc. v. Sebelius*, No. CIV-13-1092-D, 2013 WL 6804259, at *6 (W.D. Okla. Dec. 20, 2013) (citing 42 U.S.C. § 2000bb-1). Therefore, in order to establish a claim under RFRA, a plaintiff must first show "that the government substantially burdens a sincere religious exercise." *Hobby Lobby*, 723 F.3d at 1125-26 (citation omitted). If the plaintiff can establish this, then the burden shifts to the government "to show that the 'compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Id.* at 1126 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006)) (internal quotation

marks omitted). Notably, even at the preliminary injunction stage, RFRA's burden-shifting approach applies. *Id.* (citing *Gonzales*, 546 U.S. at 429).

In this case, Defendants do not challenge whether Plaintiffs possess sincere religious beliefs or whether Plaintiffs' opposition to the contraceptive mandate is a religious exercise. Additionally, Defendants concede that this Court is bound by *Hobby Lobby* in determining that the federal government cannot satisfy the compelling interest test. *See* Doc. No. 29, at 26-27. Therefore, Plaintiffs' likelihood of success on the merits with regard to their RFRA claim turns on whether Plaintiffs can establish a substantial burden on their religious exercise under RFRA. And because Plaintiffs' arguments concerning a substantial burden on their religious exercise necessarily differ based upon the way the challenged provisions operate against them, the Court will examine the claims of both the Group I and Group II Plaintiffs separately.[10]

Under RFRA, an act by the government imposes a substantial burden on religious exercise if it "(1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent . . . to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1138 (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010)) (internal quotation marks omitted).

---

[10] As explained *supra* at page 8 n. 6, with regard to the Group III Plaintiff, Good Will Publishers, the Court is bound by the Tenth Circuit's decision in *Hobby Lobby*, meaning the Court need not analyze the likelihood of success of Good Will Publishers' RFRA claim.

**1. Group I Plaintiffs**

Plaintiffs acknowledge that the Group I Plaintiffs, the Archdiocese of Oklahoma City and the Archdiocese of Baltimore, are wholly exempt from the contraceptive mandate. But Plaintiffs still assert that the "Group I Members are burdened because they must either sponsor health plans that include [contraceptive] coverage, expel the non-exempt ministries from their plans, or drop their plans altogether." Doc. No. 5, at 20. This is so, Plaintiffs argue, because the contraceptive mandate "directly interferes with Group I Members' health arrangements, in which non-exempt employers (Group II Members) often participate." Doc. No. 5, at 20. The Court understands Plaintiffs' position to be that although the Group I Plaintiffs are exempt from the provisions they challenge, the Group I Plaintiffs' religious exercise in providing non-exempt Catholic employers with access to their self-insured health plans is still substantially burdened by the provisions' effect on these non-exempt employers.

Of at least six cases to have considered the question of whether an employer exempted from the contraceptive mandate can still establish a substantial burden under RFRA, three courts have sided with the plaintiffs,[11] and three have sided with the defendants.[12] Even though it appears to be a close question, this Court is unpersuaded that the challenged provisions of the ACA impose a substantial burden on the Group I

---

[11] *See Catholic Diocese of Beaumont v. Sebelius*, No. 1:13-CV-709, --- F. Supp. 2d ----, 2014 WL 31652, at *8 (E.D. Tex. Jan. 2, 2014); *Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius*, No. 1:12-CV-159 JD, --- F. Supp. 2d ----, 2013 WL 6843012, at *14 (N.D. Ind. Dec. 27, 2013); *Zubik v. Sebelius*, Nos. 13-CV-1459, 13-CV-0303 Erie, --- F. Supp. 2d ----, 2013 WL 6118696, at *25-27 (W.D. Pa. Nov. 21, 2013).

[12] *See Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-CV-03489-WSD, 2014 WL 1256373, at *16 (N.D. Ga. Mar. 26, 2014); *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-01303, 2013 WL 6834375, at *5 (M.D. Tenn. Dec. 26, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12 Civ. 2542(BMC), --- F. Supp. 2d ----, 2013 WL 6579764, at *15 (E.D.N.Y. Dec. 16, 2013).

Plaintiffs' religious exercise. This is because the challenged provisions ask nothing of these exempted Plaintiffs. *See Catholic Diocese of Nashville*, 2013 WL 6834375, at *5 ("As for the Plaintiffs that are entirely exempt from contraceptive coverage, . . . the regulations do not place any burden, much less a *substantial* one, on the exercise of their religious beliefs."); *Roman Catholic Archdiocese of N.Y.*, 2013 WL 6579764, at *15 ("That the *non-exempt* plaintiffs must either provide coverage or complete the self-certification cannot be a burden on the *exempt* plaintiffs' religion."). The Court's view is bolstered by the fact that the remainder of the Court's opinion will explain why the Group II and Group III Plaintiffs—the non-exempt employers that participate in the Group I Plaintiffs' health plans—are entitled to relief.

## 2. Group II Plaintiffs

As for the Group II Plaintiffs, Catholic Charities, All Saints, Catholic Review Media, and Villa St. Francis, these Plaintiffs qualify for the accommodation. Yet Plaintiffs contend that their religious exercise is still substantially burdened by the challenged provisions—particularly the accommodation—and the Court agrees. While Plaintiffs believe in the Catholic teaching that their ministries should include the provision of health care to their employees, whenever possible, Plaintiffs also believe in the Catholic teaching that any artificial interference with the creation and nurture of new life is wrong. Thus, it would be contrary to this belief for Plaintiffs to provide health benefits to their employees that include coverage for contraception, abortion-inducing drugs and devices, surgical abortion, sterilization, and related counseling. Furthermore, Plaintiffs believe that executing EBSA Form 700 in an effort to take advantage of the so-

called accommodation makes them "the central cog" in the provision of the contraceptive services to which they religiously object. Consequently, if Plaintiffs were to complete and deliver the self-certification to their issuers or TPAs, it would violate their sincere religious beliefs concerning contraception.

With this in mind, under the challenged regulations, these Group II Plaintiffs have four options from which they can choose: (1) directly provide contraceptive coverage to their employees; (2) refuse to provide the coverage and face severe monetary penalties; (3) completely drop their employees' health plans and face monetary penalties for doing so; or (4) self-certify that they qualify for the accommodation by filling out EBSA Form 700. In other words, Plaintiffs can choose from either violating their sincerely held religious beliefs in a variety of ways, or facing severe monetary penalties that would quite likely ruin them. Without question, then, the challenged provisions of the ACA present these Plaintiffs with a "Hobson's choice," meaning that Plaintiffs have established a substantial burden under RFRA. *See Hobby Lobby*, 723 F.3d at 1141; *Abdulhaseeb*, 600 F.3d at 1317; *see also S. Nazarene Univ. v. Sebelius*, No. CIV-13-1015-F, 2013 WL 6804265, at *8 (W.D. Okla. Dec. 23, 2013).

Defendants' arguments do not compel a different conclusion. Defendants downplay the importance of executing EBSA Form 700, as well as maintain that any burden imposed by the challenged regulations is indirect and too attenuated to be substantial. But the Court's inquiry is focused upon how the plaintiffs themselves measure their degree of complicity in an immoral act, not whether a reasonable observer would consider the plaintiffs complicit in such an act. *See Hobby Lobby*, 723 F.3d at

1142; *S. Nazarene Univ.*, 2013 WL 6804265, at *8; *Reaching Souls*, 2013 WL 6804259, at *7-8. Here, Plaintiffs sincerely believe that in executing the form and providing it to their issuers or TPAs, they play a central role in the provision of contraceptive services to their employees—something Plaintiffs find morally repugnant. This is where the Court's inquiry ends, as it is not the Court's role to say Plaintiffs' religious beliefs are mistaken. *See Roman Catholic Archdiocese of N.Y.*, 2013 WL 6579764, at *14 (citations omitted). Finally, the Court would be remiss if it failed to mention its awareness that the vast majority of courts that have considered this issue have sided with the plaintiffs, including two decisions from judges sitting in this Court.[13] *See Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 564 n.1 (7th Cir. 2014) (Flaum, J., dissenting) (collecting cases); The Becket Fund for Religious Liberty, "HHS Mandate Information Central," www.becketfund.org/hhsinformationcentral (last visited June 3, 2014).

## B. Likelihood of Success on the Merits under the Establishment Clause

Because the Court has found that the Group II Plaintiffs have shown a likelihood of success on the merits under RFRA, and because Defendants concede that the Group III Plaintiff has shown a likelihood of success on the merits under RFRA based upon the Tenth Circuit's decision in *Hobby Lobby*, the Court declines to address the Group II and Group III Plaintiffs' claim under the Establishment Clause. *See Lyng v. Nw. Indian*

---

[13] The case law regarding this issue is quickly developing. By the Court's count, nonprofit plaintiffs in twenty-two of twenty-three cases have received preliminary injunctions from either a district court or court of appeals. That is, only one nonprofit plaintiff has been denied preliminary injunctive relief from both a district court and court of appeals. *See Univ. of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014). Currently, one other group of nonprofit plaintiffs is facing this possibility, as a district court denied their request for preliminary injunction within the past few weeks. *See Diocese of Cheyenne v. Sebelius*, No. 14-CV-21-SWS, --- F. Supp. 2d ----, 2014 WL 1911873 (D. Wyo. May 13, 2014). This group of plaintiffs has since filed a motion for injunction pending appeal with the Tenth Circuit, which is yet to be decided.

*Cemetary Protective Ass'n*, 485 U.S. 439, 445 (1988). And with regard to the Group I Plaintiffs, the Court finds that their Establishment Clause claim fails for the same reason that their RFRA claim fails—it is undisputed that they are exempted from the contraceptive mandate, and thus they cannot claim to be harmed by it. *See Roman Catholic Archdiocese of N.Y.*, 2013 WL 6579764, at *20.

## C. Remaining Requirements for Preliminary Injunction

As the Court previously found, the Group II and Group III Plaintiffs have established a likely RFRA violation.[14] With regard to the remaining requirements for a preliminary injunction, "establishing a likely RFRA violation satisfies the irreparable harm factor." *Hobby Lobby*, 723 F.3d at 1146 (citations omitted). Additionally, the Court finds that the harm to these Plaintiffs outweighs any harm to Defendants' interest in enforcing the challenged regulations. Defendants contend that there is inherent harm in prohibiting them from enforcing the challenged regulations against these Plaintiffs. Yet Defendants have already exempted health plans covering millions of others, including those plans of many religious organizations. This brings into question how tangible the harm could possibly be by the Court's entry of a preliminary injunction in Plaintiffs' favor. By comparison, the harm posed to these Plaintiffs absent relief is quite tangible— they will either face severe monetary penalties or be required to violate their religious beliefs. And finally, because of the legal uncertainty presented by the contraceptive mandate in light of both the Tenth Circuit's decision in *Hobby Lobby*, as well as the numerous courts to have weighed in on the issues presented by the accommodation, the

---

[14] Once again, Defendants have conceded that the Tenth Circuit's decision in *Hobby Lobby* dictates that the Group III Plaintiff has established a likely RFRA violation. *See* Doc. No. 29, at 21 n. 8.

Court finds that the public interest lies in preserving the status quo, meaning that Defendants should not be allowed to enforce the challenged regulations against these Plaintiffs until their claims are resolved.

In summary, the Court finds that the Group I Plaintiffs are not entitled to any relief due to the fact that they are wholly exempted from the contraceptive mandate. That said, the Group II and Group III Plaintiffs are entitled to a preliminary injunction based upon their RFRA claims.

## D. Extension Beyond Named Plaintiffs

Because Plaintiffs are attempting to certify a class in this case, they have requested that the Court extend preliminary relief beyond the named parties in order to protect a putative class of entities similarly situated to the named parties. With respect to this, Plaintiffs and Defendants agree that it would be proper for the Court to extend any preliminary injunctive relief beyond the named Plaintiffs without first ruling on the motion for class certification. Plaintiffs and Defendants disagree, however, as to the scope of this extended relief. Plaintiffs argue that the Court should grant relief to all present and future members of the CBA, while Defendants argue that the Court should grant relief only to the present members of the CBA, with certain additional limitations placed upon the entitlement to relief of those present members of the CBA that fit within Group III (entities that are neither exempt from the contraceptive mandate nor qualify for the accommodation).

Having considered the parties' arguments, the Court will extend preliminary relief to all present members of the CBA that fit within Groups II and III. That is, current

members of the CBA that either qualify for the accommodation as nonprofit religious employers, or bear the full weight of the contraceptive mandate as non-exempt employers that do not qualify for the accommodation, are entitled to preliminary relief. Granting relief to all future members of the CBA that fit within Groups II and III would upset the status quo, and it is too difficult for the Court to presently determine whether these future members are entitled to relief.[15] Similarly, the Court sees no reason why it should complicate current Group III members' entitlement to preliminary relief by limiting how far the relief to current Group III members extends. Accordingly, the Court will extend preliminary injunctive relief to all current Group II and Group III members of the CBA.[16]

## IV. Conclusion

Based upon the foregoing, Plaintiffs' Motion for Preliminary Injunction is DENIED in part, and GRANTED in part. Good Will Publishers and the CBA possess constitutional standing to sue in this case, and the CIC lacks standing to sue in this case. Additionally, while the Group I members of the CBA are not entitled to preliminary injunctive relief, the Group II and Group III members of the CBA are entitled to preliminary injunctive relief based upon their RFRA claims, and this relief will extend to all current Group II and Group III members of the CBA.

---

[15] In arguing that all future members of the CBA should fall within the scope of the preliminary injunction, Plaintiffs' reliance on Judge DeGiusti's Order in *Reaching Souls* is misplaced. In *Reaching Souls*, the parties fully agreed with respect to the scope of the preliminary injunction. *See* 2013 WL 6804259, at *1 (noting that "Defendants 'do not object to the scope of the resulting preliminary injunction including the named plaintiffs as well as any members of the class plaintiffs have proposed in their complaint'"). And here, the parties clearly disagree as to the scope of the preliminary injunction, rendering *Reaching Souls* unconvincing on this point.

[16] It is worth noting that all current Group II and Group III members of the CBA were required to meet certain tests in order to be eligible for membership in the CBA, as set out in the CBA's Articles of Organization and Bylaws. *See* Doc. No. 1, at 24-25 & Exs. A-B. The Court is satisfied that these tests have ensured the uniformity of belief among the current Group II and Group III members to which this preliminary relief will extend.

## PRELIMINARY INJUNCTION

Defendants, their agents, officers, and employees, and all others in active concert or participation with them, are hereby ENJOINED AND RESTRAINED from any effort to apply or enforce, as to current members of the Catholic Benefits Association LCA who either qualify for the accommodation (Group II members), as defined by 26 C.F.R. § 54.9815-2713A(a), 29 C.F.R. § 2590.715-2713A(a), and 45 C.F.R. § 147.131(b), or neither qualify for the "religious employers" exemption nor qualify for the accommodation (Group III members), the substantive requirements at issue in this case that are imposed by 42 U.S.C. § 300gg-13(a)(4) and its related regulations, including any penalties, fines and assessments for noncompliance with these provisions, until further order of the Court.

IT IS SO ORDERED this 4th day of June, 2014.

_David L. Russell_

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**