# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION LCA, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 14-cv-240-R |
| v. | ) ) | and |
| AZAR, *et. al.*, | ) ) | No. 14-cv-685-R |
| Defendants. | ) ) | |

## L. MARTIN NUSSBAUM DECLARATION

I am over eighteen. I have personal knowledge the facts herein, and I affirm their truthfulness. I serve as lead attorney for the plaintiffs.[1] I offer this declaration in support of plaintiffs' application for attorneys' fees and expenses under 42 U.S.C. § 1988(b).

Plaintiffs seek payment of $3,334,696.50 for fees for 6,538.15 hours of work by attorneys and paralegals at Lewis Roca Rothgerber Christie LLP and for $39,188.06 in costs. The fees and hours are summarized in Appendix I. The costs are described in Section VII of this declaration.

In support of this request, I offer the following.

---

[1] This memorandum refers to *CBA I*, No. 14-cv-240, and *CBA II*, No. 14-cv-685, as a single case. Unless otherwise indicated, references to the docket will be entries in *CBA I*.

EXHIBIT A

# TABLE OF CONTENTS

I.      Introduction. ........................................................................................... 1

II.     Qualifications. ....................................................................................... 2

III.    Opinion. .................................................................................................. 3

IV.     Outstanding results. .............................................................................. 3

    A.    Relief for over 1,000 Catholic employers. ....................................... 3

    B.    Relief from over $6.9 billion in fines. ............................................. 4

    C.    Relief sufficient for many CBA members saves expense of
        maintaining grandfathered plans. ..................................................... 5

    D.    Relief for Group I members permitting them to provide morally
        compliant coverage for non-exempt affiliated ministries. ............... 5

    E.    Relief for members' insurers and TPAs. ............................................ 6

    F.    Relief for future CBA members. ........................................................ 6

V.      Scope of effort ....................................................................................... 6

    A.    CBA secured first preliminary injunction (April-June 2014). ......... 7

    B.    CBA moved for relief for new members. ........................................... 9

    C.    Second lawsuit for new members (July-December 2014). ................. 9

        1.    CBA filed second verified complaint and secured TRO. .................... 9

        2.    Two new regulations required third verified complaint and new
            motion for preliminary injunction. ............................................. 10

        3.    Departments sought new lawsuits for each new CBA member. ......... 10

        4.    Second preliminary injunction confirmed that mandate's
            illegality unaffected by Departments' new regulations. ................... 10

    D.    Extensive litigation required to secure relief for new CBA members
        (January 2015-April 2017). ............................................................. 11

        1.    CBA again asked Court to extend injunctions to new members. ....... 11

        2.    Departments renewed their opposition while suggesting
            negotiation of protocol for new CBA members. .............................. 11

        3.    Departments reneged and sought mini-trial for each new
            member. ...................................................................................... 12

        4.    CBA asked for a simplified protocol after negotiations failed. ......... 13

        5.    Departments raised forum shopping and comity arguments. ............. 13

        6.    Court adopted the CBA's proposed simplified protocol. .................... 14

        7.    Departments repeatedly object to motions under new protocol. ........ 14

    E.    Departments filed six appeals from this Court's orders. ................... 15

    F.    With the CBA appeals under abeyance, the CBA protected its
        members' interests by monitoring related cases and supporting the
        Little Sisters of the Poor at the Tenth Circuit and the Supreme Court. ........ 16

        1.    CBA helped other mandate plaintiffs prepare for Tenth Circuit
            argument. .................................................................................... 16

        2.    CBA submitted two amicus briefs to Supreme Court. ...................... 17

i

EXHIBIT A

3.      Supreme Court declined to rule on the accommodation's legality, and urged parties to negotiate a resolution............................ 21

G.      Departments rejected the Supreme Court's call to respect petitioners' religious conscience and work toward compromise. .................................... 22

    1.      Departments claimed *Zubik* decision gave them new license to hijack CBA members' plans. ......................................................... 22

    2.      Departments rejected religious employers' concerns and declared they would maintain "accommodation." ............... 23

H.      Departments finally admitted that CASC mandate violated RFRA............... 24

    1.      After presidential Executive Order, Departments showed new openness to religious liberty concerns. ................................ 24

    2.      In October 2017, Departments issued interim final rules admitting "accommodation" is illegal.................................. 25

    3.      Departments abandoned efforts to overturn this Court's preliminary injunctions. ...................................................... 26

    4.      Seven states, ACLU, and others filed lawsuits against the IFR......... 26

I.      CBA unsuccessfully sought settlement. ........................................................ 27

J.      CBA secured permanent injunction. ............................................................. 27

VI.      Aggravating Factors. ........................................................................................ 29

A.      Work required due to scope of litigation. ..................................................... 29

    1.      Defendants knew mandate would trigger lawsuits............................ 29

    2.      Substantial client communications...................................................... 31

    3.      Coordinating with counsel in other mandate cases. .......................... 31

    4.      Monitoring other mandate cases. ....................................................... 32

    5.      Monitoring new lawsuits against Departments' IFR. ....................... 35

B.      Eighteen regulatory changes. ....................................................................... 35

C.      Departments' wrong positions required more effort to defeat them. ........... 36

    1.      Departments misrepresented the accommodation............................. 36

    2.      Departments misrepresented Department of Labor's authority. ........ 36

    3.      Departments misrepresented Congress' interest. .............................. 37

    4.      Departments misrepresented the Institute of Medicine report. .......... 38

    5.      Departments misrepresented their need for names of CBA members. ............................................................................................. 41

VII.      Costs ...................................................................................................................... 43

CONCLUSION ................................................................................................................. 44

Appendix I: Litigation Fees ............................................................................................ 45

Appendix II: Regulatory Changes .................................................................................. 46

Appendix III: Nussbaum Resume ................................................................................... 54

Appendix IV: Kniffin Resume ........................................................................................ 58

Appendix V: Mahaffey Resume ...................................................................................... 61

Appendix VI: Speir Resume............................................................................................ 63

EXHIBIT A

## I.     Introduction.

On March 8, 2018, four years after the Catholic Benefits Association and the other plaintiffs (collectively "CBA") filed its first of three verified complaints, this Court granted the CBA's motion for permanent injunction and declaratory relief and entered judgment in favor of the CBA and its members. This is an extraordinary case in many regards, including:

- CBA, through the doctrine of association standing, represented over 1,000 Catholic employers plus almost 4,000 Catholic parishes; this not only required formation of the association but also substantial efforts to inform the members of the association about the litigation and its implications;

- CBA did much of its work and advocacy outside this Court's vantage;

- The litigation was conducted under the unique circumstance in which over 100 other similar cases were being adjudicated; this required our legal team to monitor arguments and rulings in those cases;

- Some of the cases—particularly *Hobby Lobby* and *Little Sisters of the Poor*-- created controlling precedents in the Tenth Circuit; these and other cases required the United States Supreme Court to issue six orders and opinions; both the Tenth Circuit and U.S. Supreme Court litigation would potentially create controlling precedents affecting the CBA lawsuits;

- The litigation was also conducted against a moving target as the Departments' amended their original **c**ontraception, **a**bortifacient, **s**terilization, and related **c**ounseling ("CASC") mandate by other lengthy and complicated regulations seventeen times;

- Key arguments pressed by the Departments' counsel at this and other District Courts and at eight Circuit Courts of Appeal were legally incorrect and greatly expanded the scope of this litigation; the Solicitor General abandoned arguments when the cases were before the Supreme Court and the present administration has done so as well;

- The results for the CBA were outstanding; it prevailed on its lead argument based on the Religious Freedom Restoration Act; it acquired declaratory relief and permanent injunction; this relief eliminated over $6.9 billion in accumulated fines; it permitted CBA's exempt members to continue to sponsor morally

EXHIBIT A

compliant plans for both the exempt and non-exempt participating members they served; and all of this was achieved at the cost of around $3,300 in fees per member.

## II.    Qualifications.

Our law firm is one of a handful in the United States with a religious institutions practice.  With some twenty lawyers working in our group, it is one of  the largest religious institutions practices in the nation.  This practice is national.  We have completed scores of successful representations and advocacy in forty  states and before civil and ecclesiastical courts at all levels.  Our clients come from many religious traditions, including Catholic, Mainline Protestant, Evangelical Protestant, Jewish, Mormon, Muslim, and others.  They also include diverse types of religious institutions including denominations, dioceses, eparchies, churches, synagogues, mosques, monasteries, ashrams, schools, colleges, hospitals, faith-based social service agencies, and closely-held for profit businesses operating according to the religious values of their owners.  Because of these representations, our experience is unique and our reputation is national.

I serve as founder and co-chair of that group, as general counsel for the Catholic Benefits Association and other religious institutions, and as lead counsel for the CBA in this litigation.  Five members of our firm's religious institutions group are responsible for 95% of the total hours billed on this matter.  They are Eric Kniffin, Bill Mahaffey, Ian Speir, Arlene Martinez, and me.  Eric, Ian, and I are First Amendment and religious organizations trial and appellate advocates.  Bill is a tax, employee benefits, and exempt organizations lawyer.  Arlene is an experienced litigation paralegal.  I have attached abbreviated resumes for Eric, Bill, Ian, and myself as Appendixes III through VI.  More

EXHIBIT A

information about our firm's religious institutions practice is at

https://www.lrrc.com/religious-institutions#repmatter.  More about the lawyers who billed

on this matter is at https://www.lrrc.com/people.

## III.   Opinion.

I also served as the billing attorney for all work performed by our firm for the CBA

on this case. I reviewed the hours submitted by all the lawyers and paralegals and

exercised billing judgment in adjusting or removing billing entries that I deemed

"excessive, redundant, or otherwise unnecessary" as required by *Hensley v. Eckerhart*, 461

U.S. 424, 434 (1983).  The actual hours our firm billed the CBA are reported on Appendix

I.  Based on my experience and given the principles at stake, the fines threatened, the

complexity of this litigation, and the evolving regulations and government arguments, I

believe the hours spent by our attorneys and paralegals are reasonable.

## IV.   Outstanding results.

The litigation has achieved outstanding results for the CBA and its members.

### A.   Relief for over 1,000 Catholic employers.

The CBA's lawsuit has secured relief from the CASC mandate for 1,000 Catholic

employers plus almost 4,000 Catholic parishes. The CBA's member-employers include

over sixty Catholic dioceses and archdioceses, along with religious orders, hospitals,

Catholic Charities, mental health service providers, counseling centers, nursing homes,

senior residence facilities, schools, colleges, and other Catholic ministries and Catholic-

owned businesses. CBA members sponsor 142 benefit plans that include 911 participating

employers.  These plans cover 88,285 employees.  Although religious employers brought

EXHIBIT A

more than 100 separate lawsuits against the CASC mandate, the District Court's permanent injunction protects more religious employers from the CASC mandate than all of these other lawsuits combined.

By utilizing associational standing, the CBA has acquired religious liberty protection here for fees at around $3,300 per employer—a remarkably efficient result.

**B.      Relief from over $6.9 billion in fines.**

The financial stakes in this litigation were enormous. Refusing to comply with the Departments' mandate and violate their consciences exposed non-exempt CBA members to fines of "$100 for each day in the noncompliance period *with respect to each individual* to whom such failure relates." 26 U.S.C. § 4980D (emphasis added).

We determined the total fines at issue for CBA non-exempt members by estimating the number of covered employees in non-exempt (Group II and Group III) CBA members and multiplying that number by the number of days since the mandate took effect and then multiplying that product by $100 per day.

This is a conservative estimate. Even though IRS interprets Section 4980D as a fine that applies "per affected beneficiary,"[2] the CBA has only based its estimate on CBA members' number of employees. Based on our experience, most Catholic employer health plans cover not only employees but an average of three additional family members. If so, accumulated fines avoided through this case likely exceeds $20 billion. Taking even the

---

[2] Internal Revenue Bulleting: 2009-41 (Oct. 13, 2009), https://www.irs.gov/irb/2009-41_IRB (IRS interprets Section 4980D as a fine applied "per affected beneficiary").

EXHIBIT A

CBA members' $6.9 billion exposure places the CBA's request for $3.335 million in attorneys' fees in perspective. The CBA is asking for $1 in attorneys' fees for every $2,090 in fines that its members avoided.

### C. Relief sufficient for many CBA members saves expense of maintaining grandfathered plans.

The CBA's victory has also benefitted CBA members who have held onto their grandfathered status as backstop protection from the CASC mandate. *See* Verified Compl. ¶¶ 146-48 ("VC"). The Departments recognized that, over time, maintaining grandfathered status would become prohibitively expensive. *See CBA II* ECF No. 36 at 18. Even so, some non-exempt CBA members kept grandfathered plans because they feared this Court's preliminary injunction might not be made permanent.  With that fear relieved, they are free to give up grandfathered status.  One CBA member will save over $1 million yearly when it does so.

### D. Relief for Group I members permitting them to provide morally compliant coverage for non-exempt affiliated ministries.

The CBA's victory benefits Group I members, many of which sponsor health plans and invite their non-exempt affiliates to join those plans as participating employers.  As the CBA has explained earlier, "by including affiliated ministries in their health plans," dioceses and other plan sponsors "support affiliated ministries, educate ministry leaders on Catholic doctrine, and model ways to access morally compliant health care—all of which further their religious exercise and pastoral ministry."  ECF No. 48 at 12-13 (citing ECF No. 5 at 14, VC ¶¶ 253-60).

EXHIBIT A

### E.     Relief for members' insurers and TPAs.

Many insurers and TPAs of plans sponsored by CBA members were uncomfortable issuing a plan that was out of compliance with the mandate without a court order clarifying that the court's injunction extended to these third parties. Because of this, we asked the Court, in the fall of 2014, to amend its preliminary injunction order to clarify that its relief extends to members' insurers and TPAs. The Court's subsequent orders and its March 7 permanent injunction have all included this clarifying language.

### F.     Relief for future CBA members.

Over the Departments' repeated objections, the CBA convinced the Court to extend relief to the CBA's future members. This victory is of great value to the CBA as it permits the CBA to serve new members without constantly coming back to court for relief.

## V.     Scope of effort

This section summarizes our team's work to free the CBA, its members, and their respective insurers and TPAs from the mandate. The Departments made much of this work necessary through their aggressive and sometimes misleading defense of the mandate. They told this Court things about the mandate and their power to enforce it that they later admitted were untrue. After this Court rejected their arguments, the Departments still advanced them in nine courts of appeals, only abandoning them under Supreme Court scrutiny. Even then, after the Supreme Court ordered the parties to work out their differences, the Departments tried to use that order as authority to force TPAs to provide CASC services in objecting employers' plans. This increased the complexity of this case.

EXHIBIT A

### A.     CBA secured first preliminary injunction (April-June 2014).

On April 12, 2014, the CBA filed its initial verified complaint. ECF No. 1. The complaint—even without its seven attachments—stretches over 94 pages. It details how the Departments created the CASC mandate, and explains how it affected each of the eight named plaintiffs and each class of CBA members. The complaint alleges ten causes of action, including violations of RFRA; the Establishment, Free Exercise, and Speech Clauses; and the Administrative Procedure Act. VC ¶¶ 296-384. This complex complaint reflects the substantial groundwork required in preparation for this lawsuit.

In the second half of 2013, Archbishop Lori and other Catholic leaders engaged our firm to form the Catholic Benefits Association as a § 501(c)(3) Oklahoma limited cooperative association in a manner that would make it a Catholic ministry capable of invoking associational standing so it could bring this case for all its members.  We prepared CBA's organizational documents and membership application forms and included within those documents many unique provisions necessary to establish that CBA's members were Catholic, that they held common beliefs, and that those beliefs were burdened in similar ways by the CASC mandate.

These provisions also created the CBA Ethics Committee. Several of the Departments' revisions to the mandate required formal moral analysis to assess whether they burdened Catholic beliefs. Under the CBA's organizing documents, Ethics Committee resolutions became binding on CBA's members. The Ethics Committee made these assessments.  It sometimes did so only after consultation with the United States Conference of Catholic Bishops ("USCCB") Doctrine Committee and with the National

EXHIBIT A

Catholic Bioethics Center ("NCBC").  The Ethics Committee was essential in the litigation to establish that CBA members were so unified in their beliefs that they would not have to file separate lawsuits as the Departments argued. *See* ECF No. 68 at 8-10. For the Ethics Committee to do its work, our legal team had to provide explanation and prepare memoranda on the regulatory changes so that the Committee might understand civil law rules upon which it made its moral judgments. We sometimes also provided such explanations to the USCCB's Doctrine Committee and to the NCBC.

Along with its verified complaint, the CBA filed a motion and brief for preliminary injunction. ECF Nos. 4-5. The Departments responded on April 2, and the ACLU filed an amicus brief in support. ECF Nos. 29, 31-32. The CBA filed its reply on April 9, ECF No. 48, and participated in oral argument on May 8, ECF No. 59.

Before the CBA filed its reply, the CBA also filed a motion for class certification. ECF No. 53. This motion was also fully briefed by the end of May. ECF Nos. 58 and 64.

On June 4, 2014, the Court issued an order granting the CBA a preliminary injunction. ECF No. 68. The Court focused primarily on the CBA's arguments under the Religious Freedom Restoration Act ("RFRA") and found that the CBA had associational standing to represent its members, making it unnecessary for the Court to rule on the CBA's motion for class certification.

The Court's order gave the CBA almost all it requested, except that it yielded to the Departments' argument by not extending relief to future members. ECF No. 68 at 19-20.

EXHIBIT A

**B.    CBA moved for relief for new members.**

The CBA thereafter continued to add new members. In mid-June, it asked the Court to extend its order to these new members by July 1, 2014. ECF No. 69. The Departments again objected, ECF No. 72, and they refused then and thereafter to explain why they opposed relief for future CBA members when they had agree to such relief in the two other mandate challenges brought as class actions. The Court sided with the Departments and on June 26, 2014, denied the CBA's motion. ECF No. 73.

**C.    Second lawsuit for new members (July-December 2014).**

**1.    CBA filed second verified complaint and secured TRO.**

In opposing the CBA's request for relief for three new members, the Departments conceded that amending the Court's preliminary injunction would promote judicial economy. ECF No. 72 at 4. All the same, however, they argued that if these new members wanted to exercise their RFRA rights, they should "fil[e] their own lawsuit, as many other organizations have done." *Id*. Five days after the Court's order denying the CBA's motion to amend its preliminary injunction, the CBA did as the Departments had suggested and filed a second lawsuit in order to protect those new members left unprotected by the Court's first injunction. *CBA II*, ECF No. 1.

Along with its second verified complaint, the CBA filed an emergency motion and brief for TRO requesting protection from the three new CBA members who became subject to the mandate that same day. *CBA II*, ECF Nos. 4-5. The Court teleconferenced with counsel that day and entered a TRO. *CBA II*, ECF No. 12. The next day, the CBA asked the Court to convert its TRO into a preliminary injunction. *CBA II*, ECF No. 14.

EXHIBIT A

**2.   Two new regulations required third verified complaint and new motion for preliminary injunction.**

In August 2014, the Departments issued two new sets of regulations that they hoped would shore up their CASC mandate in the wake of Supreme Court decisions that granted Hobby Lobby and Wheaton College relief from the mandate. After a September 15 teleconference with the Court, the parties agreed that the CBA would file its third verified complaint and a new motion for preliminary injunction. *CBA II*, ECF No. 27.

The parties agreed that the Court's TRO should continue until the Court ruled on the CBA's next motion for preliminary injunction. *Id.*, *see also CBA II*, ECF No. 20. Thus, for the next three months, every new CBA member automatically received protection from the CASC mandate. This was the same state of affairs that the Departments had vigorously opposed only three months before. Had the Departments agreed to this compromise in June 2014, the CBA's second lawsuit would  not have been necessary.

**3.   Departments sought new lawsuits for each new CBA member.**

At the same teleconference, the Departments argued that the CBA should have to file a separate federal lawsuit on behalf of each new CBA member. *See* ECF No. 87 at 3. The Court noted that the Departments' position was hugely inefficient. *Id.*

**4.   Second preliminary injunction confirmed that mandate's illegality unaffected by Departments' new regulations.**

In early October, the CBA filed its third verified complaint and a new motion for preliminary injunction. *CBA II*, ECF Nos. 29-33. After briefing, the Court entered a second preliminary injunction on December 29, 2014. *CBA II*, ECF No. 40. The Court rejected the Departments' new arguments. First, it denied that the Departments' newest regulatory

EXHIBIT A

changes to the mandate had eliminated its substantial burden on CBA members. *Id*. at 4-6,

11. Next, it rejected their argument that the Sixth, Seventh, and D.C. Circuits had correctly

determined the CASC mandate did not substantially burden religious exercise. *Id*. at 9-11.

> **D.      Extensive litigation required to secure relief for new CBA members (January 2015-April 2017).**

> **1.      CBA again asked Court to extend injunctions to new members.**

On March 4, 2015, the CBA asked the Court again to consider extending its

preliminary injunction to new members. ECF No. 87. The CBA noted that after the Court

rejected a similar request on June 26, 2014, it had entered orders that expanded the initial

injunctive relief to ensure that, as new members meeting the same criteria join the CBA,

they were also protected from the mandate while the CBA sought a final judgment. *Id*. at

1-2 (citing July 1, 2014, Order [*CBA II* ECF No. 12]; Sept. 24, 2014, Order [*CBA II* ECF

No. 28]; Dec. 3, 2014, Order [ECF No. 84]; Dec. 29, 2014, Order [*CBA II* Dkt. No. 40]).

The CBA affirmed that its newest members met the same membership criteria that

the Court, in December, had found ensured "uniformity of belief among the current Group

II and Group III members to which this preliminary relief will extend." *Id*. at 2 (citing *CBA

II* Dec. 29, 2014, Order at 15 n.4 [*CBA II* ECF No. No. 40]).

> **2.      Departments renewed their opposition while suggesting negotiation of protocol for new CBA members.**

The Departments responded by renewing their opposition to relief for future CBA

members. ECF No. 90. In doing so, they declined to explain why this approach had been

unworkable when it had been in place during the fall of 2014. The Departments

acknowledged that their opposition had consumed "the parties' and the Court's resources,"

EXHIBIT A

*Id*. at 2 n.1. They said they were willing "to attempt to negotiate . . . a mechanism whereby plaintiffs could periodically submit facts demonstrating that, under this Court's prior rulings, preliminary injunctive relief ought to be extended" to new CBA members." *Id*.

### 3.  Departments reneged and sought mini-trial for each new member.

The CBA jumped on the Departments' offer. ECF No. 91 ¶ 3. It requested a status conference to discuss what this "simplified procedure" might look like. It suggested that "such a mechanism would promote judicial efficiency by providing a simplified procedure for dealing with new CBA members and by obviating the need for additional lawsuits by the [CBA]" *Id*. ¶¶ 4-5. The next day, the Court ordered the parties to confer. ECF No. 92.

On April 20, the CBA updated the Court on the parties' negotiations. It shared that the Departments had "backed away" from their offer. The Departments were seeking "a procedure permitting them to rehash arguments this and other courts have rejected. They proposed, instead, specific discovery and briefing on each new member." ECF No. 95 at 4.

> In summary, defendants (1) object to the law of the case applying to the protocol; (2) want the option to argue regarding each new member; (3) want discovery of new members' names, plan anniversary dates, and descriptions and explanations of prior plan practices; (4) contend Group III members must have unanimous religious ownership; and (5) insist that their forthcoming regulation will automatically vacate this Court's injunctive relief.

*Id*. The Departments argued they "necessarily" needed detailed facts on each new member because "[t]he validity of [each new CBA member's] RFRA claims . . . turns on claimant-specific factors." *Id*. at 3.

The CBA objected because this Court had already rejected the Departments' claimed need for member-specific facts when it found that "the participation of the

individual members of the CBA is not required." ECF No. 95 at 6 (quoting Order, ECF No. 68 at 9-10).

The Departments subsequently confirmed that they would not agree to a simplified protocol unless the CBA submitted detailed declarations on each new member that "would permit defendants to decide whether to stipulate to the expansion of the *CBA I* preliminary injunction to cover specified new CBA members on a member-by-member basis." ECF No. 96 at 4. This identifying information still constituted "necessary details" for the Departments, despite this Court's holdings to the contrary. *Id.* at 8.

### 4. CBA asked for a simplified protocol after negotiations failed.

We argued that each of these conditions was inappropriate and inefficient. *Id.* at 5-13. The CBA also argued that such unjustified demands violated CBA members' First Amendment right to free association under *NAACP v. Alabama*, 357 U.S. 449 (1958), particularly where Defendant HHS had declared that it was at "war" with religious employers that wished to be exempt from the CASC mandate. *Id.* at 8-9.

The CBA urged the Court to adopt the simplified protocol that the Departments had rejected. *Id.* at 3-4, 13. The Court held a hearing on the April 29, 2015. ECF No. 100.

### 5. Departments raised forum shopping and comity arguments.

At the April 29, 2015 hearing, the Departments raised new forum shopping arguments against the CBA's proposed simplified protocol. *See* ECF No. 101. As a result, the Court requested briefs from the parties on this issue. *Id.* The CBA filed two notices regarding their new members' locations, each side filed a legal brief, and the Departments filed a notice of supplemental authority. ECF Nos. 102-06.

EXHIBIT A

The CBA's brief showed that the Departments' "concern" about forum shopping and comity ran directly contrary to their previous conduct in the CBA case and in other mandate litigation, where the Departments had not objected when many religious employers had filed suit outside the jurisdiction of their domicile. ECF No. 106 at 16-20.

### 6. Court adopted the CBA's proposed simplified protocol.

On May 28, 2015, the Court approved the CBA's proposed simplified protocol over the Departments' objections. ECF No. 107. The Court extended its protection to those that had joined the CBA up to the date of the Court's order and established a simplified procedure "to include organizations that join the CBA after the date of this Order within the scope of the preliminary injunction." The new procedure limited CBA's motions for new members to one time every three months and required the CBA to inform the Court of the number of new members and verify that they met the same membership requirements as before. It preserved the Departments' previous objections and stated that "the Court shall issue the order extending injunctive relief *without the need for a response brief by defendants*." ECF No. 107 at 2-3 (emphasis added).

### 7. Departments repeatedly object to motions under new protocol.

Even though the new protocol stated that there was no "need for a response brief by defendants," and even though the Court said the Departments could ask "the Court to modify or vacate this procedure at any time," *Id*. at 3, they objected to the CBA's first motion under the new protocol, ECF No. 113, obligating the CBA to reply, ECF Nos. 113-14. The Court granted the CBA's motion, confirming its simplified protocol. ECF No. 116.

EXHIBIT A

We filed again under the simplified protocol in April 2016. ECF No. 124. Again the Departments objected. ECF No. 127. Shortly thereafter, the Court granted our motion. ECF No. 128. In August 2016 we filed our third motion under the simplified protocol. ECF No. 134. The Departments again responded, ECF No. 136, the CBA again had to prepare a reply brief, ECF No. 137, and the Court again granted CBA's motion. ECF No. 138. In March 2017, the CBA filed its fourth motion under the simplified protocol. Finally, the Departments did not object, and the Court granted the CBA's motion. ECF No. 146.

### E.     Departments filed six appeals from this Court's orders.

The Departments appealed this Court's orders in *CBA I* and *CBA II* six times:

(1)     August 1, 2014 appeal of Court's June 4, 2014, order granting preliminary injunction (10th Cir. Case No. 14-6163);

(2)     February 23, 2015, appeal of Court's December 29, 2014, order in *CBA II* granting second preliminary injunction (10th Cir. Case No. 15-6029);

(3)     July 24, 2015, appeal of Court's May 28, 2015, order in which it extended its preliminary injunction and establishing simplified protocol (10th Cir. Case No. 15-6139);

(4)     January 28, 2016, appeal of Court's November 30, 2015, order extending preliminary injunction under simplified protocol (10th Cir. No. 16-3030);

(5)     July 15, 2016, appeal of Court's May 16, 2016, order extended preliminary injunction under the simplified protocol (10th Cir. No. 16-6217); and

(6)     October 28, 2016, appeal of Court's August 29, 2016, order extending its preliminary injunction under the simplified protocol (10th Cir. No. 16-6313).

EXHIBIT A

**F.     With the CBA appeals under abeyance, the CBA protected its members' interests by monitoring related cases and supporting the Little Sisters of the Poor at the Tenth Circuit and the Supreme Court.**

The Tenth Circuit placed these six appeals in abeyance after finding that the CBA appeals "present substantially the same legal questions as those present in" three other Tenth Circuit appeals scheduled for argument the week of December 8, 2014. ECF No. 82.

The CBA saw that the Tenth Circuit's resolution of the CBA appeals could be determined by its ruling in these other mandate cases. Further, the CBA had experienced how the Departments invoked their victories in other courts of appeals against the CBA. The CBA had seen how they were successfully misrepresenting their "unilateral" power to enforce the mandate to other courts of appeals and knew that these errant arguments might become errant precedents if the Tenth Circuit and other courts of appeals became echo chambers for the Departments' contentions.

In light of this, our legal team monitored the Departments' arguments at the various courts of appeals and those courts' opinions and sought to assist by staffing a moot court before the Tenth Circuit argument and provided amicus advocacy at the Supreme Court to protect the CBA's and its members' religious liberties.

**1.     CBA helped other mandate plaintiffs prepare for Tenth Circuit argument.**

The Tenth Circuit heard argument in three mandate cases in early December 2014. They were: *Little Sisters of the Poor Home for the Aged v. Burwell*; *Southern Nazarene University v. Burwell*; and *Reaching Souls International, Inc. v. Burwell*—Case Nos. 13-1540, 14-6026 and 14-6028. *See* ECF No. 82 at 1. We arranged a moot court in our Denver

office for those plaintiff attorneys making these arguments by providing a panel of

attorneys from our firm and other firms that were seasoned Tenth Circuit advocates.

### 2.      CBA submitted two amicus briefs to Supreme Court.

We submitted, on behalf of the CBA, an amicus brief in support of the Little

Sisters' petition for certiorari[3] and again on the merits. The CBA submitted the second of

these amicus briefs as an exhibit to the CBA's motion for permanent injunction and

declaratory relief, ECF No. 161-1 ("CBA Amicus"). These briefs built on the work that we

did in the CBA case, monitoring the many courts of appeals decisions in mandate cases,

especially the cases that the Departments relied on in the CBA case. *See, e.g.*, ECF No.

104 at 3-5 (listing circuit court of appeals mandate decisions).

Further analysis of the appellate mandate decisions and the Departments' legal

briefs in those cases confirmed counsel's suspicion. Counsel presented its most detailed

analysis in the amicus brief the CBA submitted to the Supreme Court in support of the

Little Sisters of the Poor and other religious employers before the Court. That amicus brief

is summarized in the CBA's motion for permanent injunction, ECF No. 161 at 5-8.

### a.      CBA's amicus brief showed that Departments misled the courts of appeals about accommodation works.

The CBA's amicus brief shows that the Departments won at the courts of appeals

because these courts uncritically accepted two inaccurate representations the Departments

---

[3] Brief of The Catholic Benefits Association and The Catholic Insurance Company, as *amici curiae* in support of Petitioners, *Little Sisters of the Poor v. Burwell*, No. 15-105 (Aug. 24, 2015), available at http://www.scotusblog.com/wp-content/uploads/2015/08/LSP-Amicus-Final.pdf.

EXHIBIT A

made about their power to make the "accommodation" work.  These arguments supported the Departments' contention that the accommodation did not burden religious exercise.

First, the Departments claimed, and the courts accepted, that they had the power to force a TPA of a self-insured ministry to deliver CASC services **outside of** and **independent of** an objecting religious employer's group health plan. CBA Amicus at 3, 11-12. The Departments told this Court that, under their "accommodation," "the provision of contraceptive services is entirely an activity of a third party, in which [a CBA member] plays no role." Dkt. 29 at 19 (citations omitted). Similarly, the Departments told the Tenth Circuit that religious employers "need not place contraceptive coverage into the basket of goods and services that constitute their healthcare plans." CBA Amicus at 11. Based on the Departments' representation, the Tenth Circuit concluded that the "accommodation" was an "opt out" that "shift[s] responsibility to non-objecting entities" and that "[o]pting out ensures they will play no part in the provision of contraceptive coverage." *Little Sisters*, 794 F.3d at 1183, 1192; s*ee also* CBA Amicus at 12-15 (surveying other similar decisions).

Second, the Departments told lower courts that, despite the plain text of ERISA 3(16), the Department of Labor has the "broad rulemaking authority" under ERISA to unilaterally turn a TPA into an ERISA-defined "plan administrator" with the fiduciary duty to deliver CASC benefits to plan participants. *Id*. at 4, 21-22. Building on this assertion, the Departments told this Court that CBA members were challenging "regulations that require them to do next to nothing, except what they would have to do even in the absence of the regulations." ECF No. 29 at 16. Likewise, they told the Tenth Circuit that objecting

employers "need only attest to their religious beliefs and step aside." CBA Amicus at 21 (citing Depts.' *Little Sisters* brief at 16 (citations omitted)); *see also id.* at 20-22 (describing similar arguments made to other courts of appeals). Based on the Departments' misrepresentations, courts of appeals rejected religious employers' claim that the accommodation's self-certification form was a "permission slip." They held that a religious employer's TPA had a legal duty to deliver CASC services *even before* an employer invoked the "accommodation" and agreed that the Departments could--on their own--designate an objecting religious employer's TPA as a "plan administrator" for CASC services. *Id.* at 22-24.

> **b.** **CBA's amicus brief showed that when the mandate came before the Supreme Court, the Departments retracted both of these critical claims.**

The CBA's amicus brief documents that after the Supreme Court decided to take up some of these Court of Appeals decisions,[4] the Departments' legal argument collapsed.

First**,** the Departments admitted that their accommodation hijacked objecting employers' plans. After briefing twenty-six cases at the courts of appeals and filing two of their four briefs opposing certiorari, the Departments made a critical concession to the Supreme Court. They finally admitted that under the "accommodation, . . . the contraceptive coverage provided by [a religious employer's] TPA is, as an ERISA matter, **part of the same ERISA plan** as the coverage provided by the employer." *Id.* at 19-20 (emphasis added). At last, this was a correct statement of law. *As the CBA has argued all along: the*

---

[4] The Supreme Court granted certiorari to review decisions from the Third, Fifth, Tenth, and D.C. Circuits that had held that the "accommodation" did not substantially burden religious exercise. *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

EXHIBIT A

"*accommodation*" *works by **hijacking** a religious employer's own plan*. *Id*. at 16-19.

Second, the Departments also walked back their story about how the "accommodation" works. They admitted that "[i]n the self-insured context, the 'accommodation' regulations designate an objecting employer's TPA as the entity legally responsible for complying with the contraceptive-coverage requirement **only after** the organization itself opts out." *Id*. at 28 (quoting Depts.' *Priests for Life* Br. in Opp. at 21 n.11 (emphasis added)). As explained in the CBA's amicus brief, this is necessarily the case because, under ERISA, only the plan sponsor has the authority to designate its TPA as the party responsible for delivering CASC services through its plan. *Id*. at 24-28. Congress has determined that the Department of Labor may overrule the plan sponsor's designation only if the plan sponsor "cannot be found." *Id*. at 25 (quoting 29 U.S.C. §§ 1002(16)(A)(iii). *This legal reality reveals the hidden purpose and actual legal effect of the government's Form 700 HHS notice: to furtively get objecting employers to **trigger** their TPA's duty to provide CASC services*.

Even though these representations were erroneous from the outset, *see id*. at 12-15, 22-24, the Departments did not abandon them until the cases came before the Supreme Court.

> ### c.   CBA's amicus brief showed that Departments conceded that they have less restrictive means of advancing their interests in CASC coverage.

Finally, while least restrictive means analysis is not relevant here given the Tenth Circuit's holding that the mandate does not serve a compelling government interest, *see* ECF No. 68 at 13, it is also of interest that only when the Departments came before the

EXHIBIT A

Supreme Court, they abandoned the less restrictive means argument they made before this Court and several courts of appeals. At last, the Departments conceded that there were less restrictive means for accomplishing the Departments' objectives, *viz.,* that their regulatory scheme "could be modified" to eliminate the self-certification requirement for religious employers with insured plans while still advancing the Departments' asserted interests. Resp'ts' Supp. Br. at 14-15, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418 et al.), available at https://s3.amazonaws.com/becketpdf/14-1418bssbUnited-States.pdf. As the petitioners noted, such an admission that less restrictive alternatives exist "alone suffices to defeat [the Departments'] RFRA defense." Pet'rs' Supp. Reply Br. at 10, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418 et al.), http://www.scotusblog.com/wp-content/uploads/2016/04/LSP-Supp-Reply-Brief.pdf.

*    *    *

In sum, the CBA's amicus brief shows that the Departments admitted, before the Supreme Court, that the decisions in the courts below that had upheld their mandate were wrong. Forcing this admission cleared the way for the CBA to acquire its permanent injunction.

### 3. Supreme Court declined to rule on the accommodation's legality, and urged parties to negotiate a resolution.

After briefing, argument, and two rounds of supplemental briefs, the Supreme Court declined to decide the consolidated mandate cases. *Zubik v. Burwell*, 136 S. Ct. 1557 (2016). Instead, it vacated the underlying court of appeals decisions, including the Tenth Circuit's decision in *Little Sisters*, and remanded to the courts of appeals so that the *Zubik* parties could be "afforded an opportunity to arrive at an approach going forward" that both

EXHIBIT A

"accommodates [the religious employers'] religious exercise" and ensures that "women covered by [their] health plans 'receive full and equal health coverage, including contraceptive coverage.'" *Id.*

### G.    Departments rejected the Supreme Court's call to respect petitioners' religious conscience and work toward compromise.

After soliciting public comments, they rejected religious employers' concerns and continued to enforce the mandate unchanged. In fact, they claimed that the *Zubik* decision gave them new license to hijack objecting religious employers' plans. These decisions required more work to defend CBA members' rights and needlessly prolonged this litigation.

#### 1.    Departments claimed *Zubik* decision gave them new license to hijack CBA members' plans.

Because of the Supreme Court's *Zubik order,* the Departments, in July 2016, asked the Tenth Circuit to give them permission to enforce the mandate against CBA members' TPAs under CBA members' group health plans. Defs' Status Report and Mtn for *Zubik Order, CBA v. Burwell*, No. 14-6163 et al (10th Cir. July 22, 2016). They argued that *Zubik* required it to issue an order at odds with this Court's preliminary injunction as follows:

> [T]he Court also expressly provided that neither its decision *nor any prior interim order* prevents the Departments from notifying plaintiffs' issuers and TPAs of their obligation to make separate payments for contraceptives under the accommodation. . . .

*Id.* at 4. The CBA responded by opposing the Departments' newest attempt to hijack CBA members' plans. Pls' Resp. in Opp. to Mot. for *Zubik* Order, *CBA v. Burwell*, No. 14-6163 *et al* (10th Cir. Aug. 29, 2016).

The Departments then filed a similar motion, asking this Court to enter a *Zubik* order. ECF No. 136 at 4-6. The CBA argued that the Departments' motion asked the Court to "change course and no longer enjoin [them] from coercing CBA members' insurers and TPAs into providing CASC services." ECF No. 137 at 1. The CBA's brief explained that the Departments had misinterpreted the Supreme Court's order. *Id*. at 2-9.

This Court rejected the Departments' request for a "*Zubik* order." ECF No. 138. The Tenth Circuit, however, issued *Zubik* orders in the CBA case and other pending mandate appeals. Order, *CBA v. Burwell*, No. 14-6163 et al (10th Cir. Sept. 13, 2016).

Fortunately, because of the CBA's earlier success,[5] the Departments were not able to use the Tenth Circuit's *Zubik* order to violate CBA members' rights. Because of these orders, the Departments did not know the names of any CBA members, save those few that agreed to be named Plaintiffs in *CBA I* and *CBA II*. As such, the Departments were unable to use the Tenth Circuit's *Zubik* order to threaten CBA members' TPAs into providing CASC services within CBA members' plans.

### 2. Departments rejected religious employers' concerns and declared they would maintain "accommodation."

The day before the Departments filed their motion for a *Zubik* order with the Tenth Circuit, they issued a Request for Information ("RFI") "to determine whether further modifications to the existing accommodation could resolve the RFRA objections asserted

---

[5] In 2014, this Court ruled that CBA's individual members need not be named plaintiffs. ECF No. 68 at 8-10. In 2015, it adopted rejected the Departments' claim that they needed detailed facts on each new CBA member. ECF No. 95-2, ECF No. 96 at 4, ECF No. 107.

EXHIBIT A

by various organizations" while still advancing the Departments' interests in expanding

CASC coverage. ECF No. 136 at 3-4 (citing 81 Fed. Reg. 47,741 (published July 22,

2016)). The Departments received over 54,000 response.[6]

On January 9, 2017, in the waning days of the administration, the Departments

announced that they were "not modifying the accommodation regulations at this time."[7]

Breathtakingly, they justified their refusal to respond to ongoing religious liberty

concerns by invoking the courts of appeals decisions the Supreme Court had vacated. They

ignored the crucial concessions they made before the Supreme Court, and they maintained

that eight of nine courts of appeals were correct to find that their accommodation did not

substantially burden religious exercise. *Id*. at 4-5. Even though they had told the Supreme

Court that their accommodation was not the least restrictive means of advancing their

interest, *supra* at II.E.2, their January 2017 FAQ still cited these vacated courts of appeals

decisions finding that their accommodation "is the least restrictive means" of advancing

their interest in expanding CASC coverage. *Id*. at 5.

### H.    Departments finally admitted that CASC mandate violated RFRA.

#### 1.    After presidential Executive Order, Departments showed new openness to religious liberty concerns.

On May 4, 2017, President Trump issued an Executive Order entitled, "Promoting

Free Speech and Religious Liberty." It section 3, "Conscience Protections with Respect to

---

[6] Dep't of Labor, FAQs About Affordable Care Act Implementation Part 36 ("FAQ") at 4, Jan. 9, 2017, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.
[7] Dep't of Labor, FAQs About Affordable Care Act Implementation Part 36 at XX, Jan. 9, 2017, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

EXHIBIT A

Preventive-Care mandate," instructed the Departments to "consider issuing amended regulations . . . to address conscience-based objections" to the challenged mandate.[8] That same day, the HHS Secretary stated: "We welcome today's executive order . . . and will be taking action in short order to follow the President's instruction to safeguard the deeply held religious beliefs of Americans who provide health insurance to their employees."[9]

### 2.   In October 2017, Departments issued interim final rules admitting "accommodation" is illegal.

On October 6, 2017, the Departments followed through by issuing Interim Final Rules ("IFR")." 82 Fed. Reg. 47792 (Oct. 13, 2017). In their IFR, they admitted that the "accommodation" substantially burdens religious exercise, *see* ECF No. 161 at 10-11, the mandate does not advance a compelling government interest, and that there is a less restrictive means for advancing their interests. *See id.* at 11-12.

For these reasons, the Departments stated:

> Because we have concluded that requiring such compliance through the mandate or accommodation has constituted a substantial burden on the religious exercise of many such entities or individuals, and because we conclude requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances.

*See id.* at 12 (quoting IFR at 47806).

---

[8] Exec. Order, No. 13798, 82 Fed. Reg. 21675 (May 4, 2017).
[9] Press Release, U.S. Dep't of Health & Human Services, Secretary Price Welcomes Opportunity to Reexamine Contraception mandate (May 7, 2017), available at https://www.hhs.gov/about/news/2017/05/04/secretary-price-welcomes-opportunityto-reexamine-contraception-mandate.html.
.

EXHIBIT A

Having concluded that the CASC mandate fails every prong of the legal test under RFRA, the Departments decided in their IFR that the "religious employer" exemption to the mandate should be expanded to include "all bona fide religious objectors." See id. at 12-13 (quoting IFR at 47806). Thus, the IFR substantially mirrored the arguments that the CBA had been making about the mandate since 2014.

### 3. Departments abandoned efforts to overturn this Court's preliminary injunctions.

The same day they issued their IFR, the Departments moved to dismiss their six appeals of this Court's orders. *See* ECF Nos. 151-50, 162-63.

### 4. Seven states, ACLU, and others filed lawsuits against the IFR.

Within a week after the Departments published their IFR, eight lawsuits were filed challenging it and seeking injunctions prohibiting the Departments from enforcing their expanded religious exemption. The plaintiffs include seven states, the ACLU, and other allied groups. [10]

We monitored these cases as we saw that they would likely determine whether the IFR would supply durable relief from the CASC mandate that CBA members needed. We also monitored them because we understood, based on conversations with counsel for the Departments, that the Departments would argue that this Court should deny any motion for a permanent injunction because the IFR made the CBA's lawsuit moot.

---

[10] *ACLU v. Wright*, No. 4:17-cv-5772 (N.D. Cal. filed Oct. 6, 2017); *California v. HHS*, No. 4:17-cv-5783 (N.D. Cal. filed Oct. 6, 2017); *Massachusetts v. HHS*, No. 1:17-cv-11930 (D. Mass. filed Oct. 6, 2017); *Washington v. Trump*, No. 2:17-cv-01510 (W.D. Wash. filed Oct. 9, 2017); *Medical Students for Choice v. Wright*, No. 1:17-cv-2096 (D.D.C. filed Oct. 10, 2017); *Pennsylvania v. Trump*, No. 2:17-cv-4540 (E.D. Pa. filed Oct. 11, 2017); *Campbell v. Trump*, No. 1:17-cv-2455 (D. Colo. filed Oct. 13, 2017); *Shiraef v. Hargan*, No. 3:17-cv-0817 (N.D. Ind. filed Oct. 31, 2017).

EXHIBIT A

## I.    CBA unsuccessfully sought settlement.

During this period, the CBA also made its own efforts through many conversations and exchange of documents to negotiate a settlement with the Departments' counsel.  These efforts eventually included face-to-face meetings in the District of Columbia with HHS Acting Secretary Eric Hargan, his senior staff and counsel on November 9, 2017 and with Attorney General Jeff Sessions and his seniors attorneys on December 5, 2017.  While the Departments were sympathetic, the parties failed to effect a settlement because the Departments insisted that the IFRs rendered the CBA's case moot.

## J.    CBA secured permanent injunction.

In light of the IFR, the CBA moved for permanent injunction on November 1. ECF Nos. 161. Our motion reviewed the litigation between the Departments and the CBA before this Court, *id*. at 1-5, and borrowed from our amicus brief to show how the Departments had effectively conceded this case, during the previous administration, before they issued the IFR, *id*. at 5-8. We explained the IFR, *id*. at 9-13, and asked for a permanent relief protecting the CBA, its members and future members, and their TPAs and insurers, *id*. at 13-16.

The Departments opposed the CBA's motion, even as they admitted they had for four years been fighting the CBA to enforce an illegal mandate. ECF No. 167. They argued that the CBA's case was moot, *id*. at 8-11, and that the CBA should not be concerned about members' ongoing exposure to billions in fines. *Id*. at 3, 11. The Departments also argued that if they resurrect their CASC mandate in the future, the CBA should have to bring a new lawsuit starting from scratch. *Id*. at 11.

The Departments also insisted they had "never enforced the prior version of the mandate against CBA's members or similar employers with religious objections." *Id*. at 3.

This ignored years of ligation against objecting employers and their letters ordering objecting employers' TPAs to cover CASC services.[11]

We replied that the IFR had not mooted the CBA's lawsuit under *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). ECF No. 168 at 1-4. We explained how permanent relief would benefit CBA members, *id.* at 4-10, and we pointed out the efforts the Departments had forced us to undertake to secure CBA's religious liberty:

> Finally, the CBA urges the Court to consider the immense efforts the Departments have forced the CBA to undergo to fight a policy they now admit was illegal. They misled this and other courts about how the CASC mandate works, Mot. at 5-8, and have fought the CBA on issues that they have conceded in other CASC mandate cases. Mot. at 4. The Departments' intransigence and litigation tactics have placed a heavy burden on the CBA's resources and those of this Court.

*Id.* at 8.

The CBA's reply attached the Departments' briefs in the lawsuits against the IFR to show that while the Departments were telling this Court that this rule mooted the CBA's lawsuit, elsewhere they were saying this same IFR was "merely temporary" and that they were "open minded" to proposed changes. *Id.* at 6-7.

In December 2017, two courts in the IFR cases enjoined the Departments from implementing the IFR. We brought these injunctions to the Court's attention. ECF Nos. 171 and 173. The Departments soon abandoned their mootness arguments. ECF No. 174.

---

[11] *See, e.g.*, 82 Fed. Reg. at 47798 ("HHS and DOL sent letters to the issuers and third party administrators of certain plaintiffs in *Zubik*, and other pending cases, directing the issuers and third parry administrators to provide contraceptive coverage to participants in those plaintiffs' group health plans under the accommodation."). *See also supra* at § V(G)(1), describing the Departments' efforts to secure a "*Zubik* order" by coercing CBA members' service providers into covering CASC services in CBA members' plans.

EXHIBIT A

The Court invited the Departments to file any objections to the CBA's proposed order. ECF No. 175. They did object—especially to relief that would protect future CBA members, ECF No. 179, thus forcing the CBA to reply. On March 7, the Court granted a permanent injunction and declaratory relief and entered judgment. ECF Nos. 184, 185.

## VI.   Aggravating Factors.

One of the factors that the Court should consider is that much of the attorneys' fees sought here are directly related to the number of changes in the CASC regulations and the Departments' choices in how they decided to litigate this particular case.

### A.   Work required due to scope of litigation.

#### 1.   Defendants knew mandate would trigger lawsuits.

The administration and the Departments knew that the CASC mandate would create a crisis for Evangelical Protestant and Catholic employers, and it did.  When they first announced the CASC mandate, it lacked any religious liberty protections whatsoever.[12] In August 2011, the Departments announced their intention to create a "religious employer" exemption from the mandate, but proposed an extremely narrow exemption.

Within the White House, Vice-President Biden and Chief of Staff Bill Daley argued for months against HHS's aggressive approach.[13] HHS Secretary Kathleen Sebelius, however, urged the President to impose the mandate on Catholic schools and charitable

---

[12] The eighteen iterations of the CASC regulation are detailed in Appendix III.
[13] Jake Tapper, Policy and Politics of Contraception Rule Fiercely Debated Within White House, ABC News, Feb. 9, 2012, http://web.archive.org/web/20170308043131/http://abcnews.go.com/blogs/politics/2012/02/policy-and-politics-of-contraception-rule-fiercely-debated-within-white-house/.

EXHIBIT A

organizations.[14] In November 2011, the President met with the USCCB President, Cardinal Timothy Dolan, to hear his concerns and to assure him that "he considered the protection of conscience sacred."[15] Cardinal Dolan left the meeting "buoyant."

HHS Secretary Sebelius dashed those hopes on January 20 when the Departments announced that they would not expand the mandate's religious exemption.[16] When the President called Cardinal Dolan about the decision, Cardinal Dolan shared with the President "that I was terribly let down, disappointed and disturbed, and it seemed the news he had given me was difficult to square with the confidence I had felt in November."[17]

Michael Wear, who served on the administration's Office of Faith-based and Neighborhood Partnerships and directed faith outreach for the President's 2012 re-election campaign, reflected on the administration's decision to ignore religious liberty concerns:

> I received the news late one January afternoon: there would be no change to the initial rule, not even a nod toward compromise or change after months of outreach, and religious organizations would have a year to comply. The narrow religious exemption would stand. This was a unique moment: never had one single policy question taken up so much of my time, for such a long time, making it all the more devastating when the wrong decision was made. . . . The outcry should not have surprised anyone in the White House. . . . What all of this means is that the administration could have better accommodated religious organizations at the outset, in August 2011, without

---

[14] *Id.*

[15] David Gibson, *Archbishop Dolan Feels Betrayed By Obama Regarding Birth Control,* Huffington Post, Jan. 25, 2012, https://www.huffingtonpost.com/2012/01/25/dolan-obama-betrayed-birth-control_n_1232364.html.

[16] Robert Pear, *Obama Reaffirms Insurers Must Cover Contraception,* NY Times, Jan. 20, 2012, https://www.nytimes.com/2012/01/21/health/policy/administration-rules-insurers-must-cover-contraceptives.html.

[17] David Gibson, *Archbishop Dolan Feels Betrayed By Obama Regarding Birth Control,* Huffington Post, Jan. 25, 2012, https://www.huffingtonpost.com/2012/01/25/dolan-obama-betrayed-birth-control_n_1232364.html.

EXHIBIT A

hindering their policy goal of expanding women's access to free contraception. They just chose not to. They chose the path of most resistance.[18]

The bottom line is that the Departments knowingly created a mandate that triggered an unprecedented number of lawsuits by religious employers. Having created this situation, the Departments cannot reasonably object to the CBA seeking reimbursement of fees for work necessary to adequately represent the interests of the CBA and its members.

### 2.    Substantial client communications.

We have also included in this petition time spent supporting the CBA and communicating with CBA members about this lawsuit.  Our legal team had to assist with substantial communications with each of the plaintiffs and the over 1,000 CBA members regarding the mandate; the many regulations revising it; this lawsuit; the members' exposure to fines; and the application of the mandate to their insurers and TPAs.  In the interest of efficiency, we sought to conduct most such communications through the CBA website and through a series of national "members-only" webinars.  Nevertheless, there were scores of inquiries from CBA members, each of which required a response.

### 3.    Coordinating with counsel in other mandate cases.

The unprecedented flood of lawsuits brought by religious employers were being defended by a relatively small number of attorneys within the Department of Justice ("DOJ").  These DOJ attorneys easily shared briefing, insights, and litigation strategy because they were essentially within the same law firm.

---

[18] Michael Wear, *Reclaiming Hope* (Kindle ed. Location 2239, Thomas Nelson 2017).

EXHIBIT A

To match DOJ's ability to coordinate, we and other plaintiff attorneys shared information and coordinating efforts. We participated in these efforts under a joint defense and common interest privilege agreement. These communications helped us offer better legal advice, to make better arguments, and to do so more efficiently--saving the CBA considerable legal fees and improving its chance for success.

### 4.     Monitoring other mandate cases.

We also needed to monitor developments in other mandate litigation.

### a.     District court cases.

More than 100 lawsuits were filed by religious employers seeking protection through the courts from the Departments' CASC mandate.[19] In the Tenth Circuit alone, at least ten lawsuits were filed. We monitored developments in these cases and often referenced these developments in our briefs. *See*, e.g., ECF No. 29 at 4.

### b.     Appellate cases.

Most of these district court cases were appealed to the courts of appeals—most often by the Departments seeking to overturn preliminary injunctions. Many were placed in abeyance by courts of appeals, but at least twenty-six were briefed at the appellate level. Courts of appeals issued at least twenty-one written opinions in mandate cases. All but the first four, three decisions in for-profit cases and the *Notre Dame I* decision, were issued while the CBA case was pending:

(1)     *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. May 23, 2013);

---

[19] *See* Becket, HHS Information Central, HHS Case Database, https://www.becketlaw.org/research-central/hhs-info-central/hhs-case-database/ (last visited April 4, 2018).

EXHIBIT A

(2)     *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. June 27, 2013),

(3)     *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. July 26, 2013)

(4)     *University of Notre Dame v. Sebelius* ("*Notre Dame I*"), 743 F.3d 547 (Feb. 21, 2014)

(5)     *Mich. Catholic Conf. and Catholic Family Servs. v. Burwell*, 755 F.3d 372 (6th Cir. June 11, 2014)

(6)     *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dept. of Health and Human Servs.*, 756 F.3d 1339 (11th Cir. June 30, 2014) (granting motion for injunction pending appeal)

(7)     *Priests For Life v. U.S. Dept. of Health and Human Servs.*, 772 F.3d 229 (D.C. Cir. Nov. 14, 2014)

(8)     *Geneva Coll. v. Sec'y U.S. Dept. of Health and Human Servs.*, 778 F.3d 422 (3d Cir. Feb. 11, 2015)

(9)     *Univ. of Notre Dame v. Burwell* ("*Notre Dame II*"), 786 F.3d 606 (7th Cir. May 19, 2015)

(10)    *Priests for Life v. U.S. Dept. of Health and Human Servs.*, 808 F.3d 1 (D.C. Cir. May 20, 2015) (denial of application to rehear en banc)

(11)    *East Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. June 22, 2015)

(12)    *Wheaton Coll. v. Burwell*, 791 F.3d 792 (7th Cir. July 1, 2015)

(13)    *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. July 14, 2015)

(14)    *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. Aug. 7, 2015)

(15)    *Mich. Catholic Conf. and Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. Aug. 21, 2015)

(16)    *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 799 F.3d 1315 (10th Cir. Sept. 03, 2015) (denial of application to rehear en banc)

(17)    *Grace Schools v. Burwell*, 801 F.3d 788 (7th Cir. Sept. 4, 2015)

(18)    *Sharpe Holdings, Inc. v. U.S. Dept. of Health and Human Servs.*, 801 F.3d 927 (8th Cir. Sept. 17, 2015)

(19)   *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. Sept. 17, 2015)

(20)   *East Texas Baptist Univ. v. Burwell*, 807 F.3d 630 (5th Cir. Sept. 30, 2015) (denial of application for rehearing en banc)

(21)   *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dept. of Health and Human Servs.*, 818 F.3d 1122 (11th Cir. Feb. 18, 2016)

We monitored these developments. First, We had to monitor these decisions because Departments cited them in the CBA case. *See, e.g.*, ECF No. 29 at 15, ECF No. 104 at 2-3; *CBA II* ECF No. 36 at 6-7. Second, these opinions took on added significance as counsel became increasingly convinced that the Departments were misrepresenting their authority to implement the CASC mandate under ERISA and that the courts of appeals were uncritically accepting the Departments' account at face value.

Further analysis of the appellate mandate decisions and the Departments' legal briefs in those cases confirmed our suspicion. We presented our detailed analysis of the amicus brief we submitted to the Supreme Court in support of the Little Sisters of the Poor. We also summarized and attached that brief in our motion for permanent injunction and declaratory relief. ECF No. 161 at 5-8,  ECF No. 161-1.

### c.   Supreme Court cases.

The Supreme Court issued orders or reasoned opinions in mandate cases six times. It granted eleven petitions for certiorari filed by religious employers seeking relief from the mandate. As explained earlier, we submitted two amicus briefs at the Supreme Court to protect the interests of CBA members. We also reviewed these Supreme Court's opinions:

(1)   *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (Jan. 24, 2014) (granting motion for an injunction pending appeal);

(2)   *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (June 30, 2014) (the CASC mandate violated RFRA as applied to for-profit religious employers);

EXHIBIT A

(3)   *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (July 3, 2014) (granting motion for an injunction pending appeal);

(4)   *Univ. of Notre Dame v. Sebelius*, 135 S. Ct. 1528 (March 9, 2015) (vacating Seventh Circuit decision and remanding for further consideration in light of *Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014));

(5)   *Michigan Catholic Conf. v. Burwell*, 135 S. Ct. 1914 (April 27, 2015) (vacating Sixth Circuit decision and remanding for further consideration in light of *Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014)); and

(6)   *Zubik v. Burwell*, 136 S. Ct. 1557 (May 16, 2016) (vacating appellate decisions in mandate cases and calling on parties to find a solution that respected petitioners' religious objections to providing CASC services).

**5.     Monitoring new lawsuits against Departments' IFR.**

When the Departments attempted to end the mandate litigation with their October 2017 IFR, eight new lawsuits immediately challenged it. *See supra* at § V(H)(4).  We monitored these lawsuits to see how the Departments' defended their IFR. Concessions in those cases proved helpful in our CBA case, especially in showing our case was not moot.

**B.     Eighteen regulatory changes.**

An extraordinary aspect of this litigation was that there have been eighteen iterations of the challenged CASC regulation as detailed in Appendix III.  The IFR itself documents sixteen of these. 82 Fed. Reg. 47792, 437794-99 (Oct. 13, 2017). Each required us to study the new rules, the Departments' statements, and their frequent references to other regulations. Several also required review by the CBA's Ethics Committee to assess whether the mandate, as modified, remained morally problematic.

C. **Departments' wrong positions required more effort to defeat them.**

1. **Departments misrepresented the accommodation.**

As the CBA has explained to this Court and most fully to the Supreme Court, the Departments distorted how the accommodation works. *See supra* at § V(F)(2). Had they told this Court and the courts of appeals what they told the Supreme Court—that the mandate works by hijacking objecting religious employers plans and forcing them to trigger CASC coverage within their plans—these lawsuits would have ended years ago.

2. **Departments misrepresented Department of Labor's authority.**

Not only did the Departments misrepresented DOL's authority to unilaterally appoint plan administrators under ERISA, they themselves used the regulatory process to create inaccurate statements their lawyers then cited to defeat religious employers in court. Their July 2015 Final Rules provide the best example of this.

In the July 2015 Final Rules, the Departments claimed that in passing "title I of ERISA," Congress gave the Department of Labor the "broad rulemaking authority . . . to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A)," including the power to issue a "DOL notification" to an objecting religious employer's TPA that would be "an instrument under which the [objecting religious employer's] plan is operated, and will supersede any earlier designation." 80 Fed. Reg. at 41,323.

The Departments' statement forced us to research ERISA and DOL regulations to see if there was any precedent for this dramatic claim. There was not. The CBA explained this in its *CBA II* motion for preliminary injunction, filed in October 2015:

> Nothing in ERISA or the ACA empowers Labor to do this. Under ERISA, it
> is exclusively the employer, as plan sponsor, who "creates the basic terms

EXHIBIT A

and conditions of the plan, executes a written instrument containing those terms and conditions, and provides in that instrument 'a procedure' for making amendments." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877 (2011) (quoting 29 U.S.C. § 1102)); *see Kaufmann v. Prudential Ins. Co. of Am.*, 840 F. Supp. 2d 495, 498 (D.N.H. 2012) ("Only the plan sponsor can set the terms of the plan and it must do so in the written instrument establishing the plan."). Labor's interpretation also violates the plain language of 29 U.S.C. § 1002(16)(A). There *is* an "orphan" provision in the statute—subparagraph (iii)—that permits Labor to designate a plan administrator in certain circumstances not applicable here. Yet if Labor already had that authority by virtue of subparagraph (i), then subparagraph (iii) becomes superfluous. Agencies may not read statutes this way. *See Corley v. United States*, 556 U.S. 303, 304 (2009).

*CBA II* ECF No. 33 at 22-23.

Had the Department of Labor acknowledged that Congress, in passing ERISA 3(16), only gave the Department the authority to appoint a plan administrator in the case of an "orphan plan"—when the plan sponsor cannot be found—it would have been much easier for courts to understand the substantial burden the accommodation places on religious employer. The Department of Labor's unsupportable claim about its own authority in the July 2015 Final Rules needlessly complicated and prolonged the CBA's lawsuit.

### 3. Departments misrepresented Congress' interest.

The Departments also misrepresented Congress' intent in passing the Women's Health Amendment, the statue they used to justify their CASC mandate. In *CBA II*, the *Departments* cited the Congressional Record to support their mandate, quoting the Amendment's sponsors, Senators Feinstein and Mikulski, who complained that women have different health needs than men and that copayments prevented women from getting certain services. *CBA II* ECF No. 36 at 17-18.

In order to respond to the Departments' representations, we studied the legislative history the Departments cited. Our reply brief showed the fruit of this effort:

EXHIBIT A

> The Departments fail to show Congress shares their interest in the mandate.
> Equally toothless is the Departments' attempt to prove that Congress passed
> the Women's Health Amendment with the CASC mandate in mind. The
> Departments quote Senator Mikulski, the amendment's sponsor, who
> laments high copayments can push women to "avoid getting [the services] in
> the first place." RB at 17. But the "services" Mikulski was referring to in the
> floor debate were those directed at preventing "the top killers of women,"
> specifically cardio and vascular disease and breast, ovarian, cervical, and
> lung cancer. 155 Cong. Rec. S12269. Elsewhere in her speech, Senator
> Mikulski mentions mammograms and diabetes, *id.*, but nowhere suggests
> that her bill will would cover contraceptives—let alone abortifacient drugs.

*CBA II*, ECF No. 39 at 4.

Had the Departments accurately conveyed the full context of Senator Mikulski's

comments, had the Departments acknowledged that Congress has never shown an interest

in a contraception mandate but rather has consistently rejected such legislation, had the

Departments studied the IOM Report and honestly conveyed what it established, we would

not have had to undertake additional work to disprove their false contentions.

### 4.    Departments misrepresented the Institute of Medicine report.

The Departments misrepresented the Institute of Medicine report that HHS invoked

to establish they had a compelling governmental interest in forcing CBA members into

providing CASC services. ECF No. 29 at 5-6, 20-21, 24-25; *CBA II* ECF No. 36 at 14-19;

See also VC ¶¶ 159-68. In so doing, they misrepresented the IOM's conclusions, just as

the IOM had misrepresented the social science supposedly supporting its conclusions.

In *CBA I*, the Departments claimed that "IOM determined that [CASC] coverage,

without cost-sharing, for these services is necessary to increase access to such services,

and thereby reduce unintended pregnancies. ECF No. 29 at 5. (citing IOM Report at 102-

03). In *CBA II*, the Departments similarly claimed that their mandate "furthers compelling

EXHIBIT A

interests by directly and substantially reducing the incidence of unintended pregnancies." *CBA II* ECF No. 36 at 15 (citing IOM Report at 103-07).

In order to respond the Departments' representations, counsel had to study the IOM Report, determine what portions of the Report might arguably support the Departments' claims, and then look behind the Report to the social science that the IOM cited in support of their own assertions.

The CBA included its findings in its preliminary injunction briefing in *CBA II*. In the CBA's opening brief, we showed that the IOM Report on which the Departments does not provide, as strict scrutiny requires, "a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012). In some cases, the CBA found that the IOM Report itself did not say what the Departments reported. Counsel showed that the "IOM Report merely claims that eliminating 'cost sharing for contraception . . . *could* greatly increase its use," and suggests that "*[i]t is thought* that greater use of [IUDs] *might* help further reduce unintended pregnancy rates." *CBA II* ECF No. 33 at 15 (quoting IOM Report at 109, 108) (emphasis added).

In other cases, counsel found that the IOM Report *claimed* a causal relationship, but the authorities it cited did not support this proposition:

> The Report asserts that "greater use of contraception . . . *produces* lower unintended pregnancy and abortion rates," but the studies it cites merely claim these factors are "associated." *Id*. at 105 (emphasis added). One cited study expressly "do[es] not attempt to resolve this debate" about the "causes

and consequences of teen pregnancy."[20] Again, the IOM Report claims that "[t]he *consequences* of an unintended pregnancy . . . have been documented." IOM Report at 103 (emphasis added). But an earlier IOM report admits it is unclear "whether the [undesirable] effect is *caused by* or merely *associated with* unwanted pregnancy," a serious "methodological problem."[21] Another cited study cautions that "although longitudinal data may provide *some inferences* about the observed associations" between "pregnancy intention and its potential health consequences," "causality is difficult if not impossible to show."[22] Without evidence of causation, "both health outcomes and pregnancy intentions may be jointly determined by a single, often unobserved factor."[23] Studies that are "based on correlation, not evidence of causation," like the IOM report, "cannot show a direct causal link." *Brown*, 131 S. Ct. at 2738-39. The government cannot just "make a predictive judgment that such a link exists, based on competing . . . studies"—"ambiguous proof will not suffice." *Id*. at 2738-39.

*CBA II* ECF No. 33 at 15-16.

The Departments did not contest the CBA's claim that HHS had "rubber stamp[ed]"

the IOM Report; they simply claimed that this did not matter.

They do not argue that their adoption meets any of the standards cited in the CBA's brief, but dismiss these citations as "wholly inapposite." *Id*. at 24 n.10. The Departments lawlessly claim they can adopt the IOM Report without "any sort of 'factual determination.'" *Id*. at 24. This is the definition of "arbitrary and capricious." The APA calls for a "probing, in-depth review" to determine whether an agency has failed to "examine the relevant data and articulate a satisfactory explanation for its actions including a rational connection between the facts found and the choice made." *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1220-21 (10th Cir. 2009) (citations omitted).

*CBA II*, ECF No. 39 at 12-13.

---

[20] John S. Santelli & Andrea J. Melnikas, *Teen Fertility in Transition: Recent and Historic Trends in the United States*, 31 Ann. Rev. Pub. Health 371, 373, 377-78 (2010).

[21] Institute of Medicine, *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families*, 65 (1995), http://www.nap.edu/catalog.php?record_id=4903 (last visited Oct. 2, 2014).

[22] Gipson, J.D., et al., *The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature*, 39(1) Studies on Family Planning, pp. 19-20 (2008).

[23] *Id*. at 20.

Had the Departments studied the IOM Report and honestly conveyed what it established, we would not have had to undertake the work necessary to uncover the Departments' misleading invocation of the IOM Report.

### 5.   Departments misrepresented their need for names of CBA members.

Shortly after the Court issued its second preliminary injunction, the Departments made what seemed at the time an important concession: they were willing "to attempt to negotiate with plaintiffs a mechanism whereby plaintiffs could periodically submit facts demonstrating that, *under this Court's prior rulings*, preliminary injunctive relief ought to be extended to specified new CBA members." ECF No. 90 at 2 n.1 (emphasis added). But when the CBA took the Departments up on their offer, it became clear that the Departments were not willing to extend relief to new members "under the Court's prior rulings." Instead, they said any relief would "necessarily be based on defendants' case-by-case determinations with regard to each new CBA member [and such ] "case-by-case determinations are necessary under RFRA [because] defendants cannot make such determinations without identifying information for new CBA members." ECF No. 95-2. The Departments maintained this position even after the CBA reminded them that this Court had held that "participation of the individual members of the CBA is not required" in this case. *Id.*; *see also* ECF No. 68 at 9.

When pressed, the Departments claimed that they needed this information to fulfill their enforcement responsibilities under their mandate. The Departments insisted that they "'must know the entities identities' 'given that the stipulations will result in defendants being preliminary enjoined from enforcing certain regulations against certain entities.'"

EXHIBIT A

ECF No. 95 at 7 (quoting Email from Grogg to Nussbaum (April 10, 2015), ECF No. 95-2 at 5 ¶ 2 (Grogg interlineation)).

We pointed out that the Departments' self-serving representation could not be squared with their own conduct. First, we argued, "[i]f defendants are to be taken at their word, they have been unable to comply with this Court's orders for nearly a year, as they do not know the name of any CBA member other than those named as plaintiffs in *CBA I*." ECF No. 95 at 7. Second, we showed that the Departments' representations could not be squared with their own CASC mandate regulations:

> The "accommodation" at issue in this case, which defendants designed on their own, does not require participating employers to publish their names or give them to the government. An "eligible organization" need only fill out Form 700 and provide a copy of this self-certification to its insurance provider or third party administrator. Verified Compl. ¶¶ 199-200. Defendants' 2013 Temporary Enforcement Safe Harbor is similar: employers were not "subject to any enforcement action by the Departments" if they completed a self-certification form and gave a copy to their insurer or TPA. Centers for Medicare & Medicaid Services, Guidance on the Temporary Enforcement Safe Harbor, June 28, 2013, https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.

ECF No. 95 at 8.

The Departments' next repeated the claim that they "were entitled to know, for enforcement purposes, which organizations are being permitted by Court order to forgo compliance with the contraceptive coverage regulations." ECF No. 96 at 8. They declined the opportunity to explain how they were otherwise able to exempt religious employers, accommodate religious employers, and obey this Court's preliminary injunction without knowing the names of the religious employers claiming such protections. *See* ECF No. 96.

EXHIBIT A

Had the Departments acknowledged that they did not need religious employers'
names in order to operate the exemption and accommodation from the mandate that they
had fashioned, and in order to honor this Court's injunction, the Departments would have
saved the CBA and this Court several rounds of negotiations, briefing, and oral argument.
*See* ECF Nos. 90-107. Additionally, the CBA would not have had to assert and defend its
members' First Amendment right to freedom of association under *NAACP v. Alabama*, 357
U.S. 449 (1958). *See* ECF No. 95 at 8-9.

**VII.   Costs**

The costs, other than those reported in the bill of costs, incurred by the CBA in this
litigation are:

| Expense | Amount |
|---|---|
| Travel, food, & lodging | $12,119.04 |
| Pro hac, PACER, & related fees | $1,121.71 |
| Other transcript services | $361.64 |
| Postage & deliveries | $427.34 |
| Legal research | $25,158.53 |
| Total | $39,188.06 |

The travel, food, and lodging expense is related to attorney appearances and
arguments at hearings in Oklahoma City, attorney meetings with client officers and
directors to report on and discuss the litigation, and two rounds of settlement discussions in
Washington, D.C. as described in this declaration.

EXHIBIT A

The other expenses summarized above—pro hac, PACER, and related fees; other transcript services; postage and deliveries; and legal research—all directly related to the litigation described in this declaration (including appeals from this Court's decisions and the CBA's Supreme Court amicus briefs), the acquisition of documents and preparation of exhibits, the review of decisions in other cases, and general legal research directly related to our advocacy described in this declaration.

## CONCLUSION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on April 20, 2018.

 /s/ L. Martin Nussbaum

## Appendix I: Litigation Fees

| Timekeeper | Year graduated from law school | Total Hours Billed | Rate | Extension |
|---|---|---|---|---|
| Frederick Baumann | 1979 | 6.30 | $670.00 | $4,221.00 |
| Emily A. Bayton | 2002 | 6.40 | $520.00 | $3,328.00 |
| Scott Browning | 1993 | 25.10 | $590.00 | $14,809.00 |
| Nicholas N. Dyer | 2008 | 107.50 | $395.00 | $42,462.50 |
| Nathaniel W. Edwards | 2008 | 19.10 | $485.00 | $9,263.50 |
| Edward A. Gleason | 1979 | 6.50 | $545.00 | $3,542.50 |
| Joel Glover | 1991 | 44.30 | $560.00 | $24,808.00 |
| John M. Guevara | 2015 | 13.50 | $335.00 | $4,522.50 |
| Eric Hall | 2000 | 9.30 | $510.00 | $4,743.00 |
| David M. Hyams | 2008 | 19.90 | $340.00 | $6,766.00 |
| Nickolas C. Jensen | 2009 | 2.70 | $360.00 | $972.00 |
| Eric N. Kniffin | 2003 | 2,397.65 | $440.00 | $1,054,966.00 |
| H. William Mahaffey | 1980 | 463.55 | $610.00 | $282,765.50 |
| L. Martin Nussbaum | 1985 | 2,498.65 | $610.00 | $1,524,176.50 |
| Brent R Owen | 2012 | 10.60 | $285.00 | $3,021.00 |
| Andrew Rubin | 2008 | 11.50 | $355.00 | $4,082.50 |
| Kyle N. Siegal | 2012 | 31.70 | $290.00 | $9,193.00 |
| Ian S. Speir | 2011 | 685.90 | $420.00 | $288,078.00 |
| Jan Steinhour | 1982 | 11.10 | $610.00 | $6,771.00 |
| Arlene K. Martinez | Paralegal 32 years | 154.90 | $250.00 | $38,725.00 |
| Karen I. Wildman | Paralegal 27 years | 12.00 | $290.00 | $3,480.00 |
| **TOTAL FEES** | | **6,538.15** | | **$3,334,696.50** |

## Appendix II: Regulatory Changes

**1.      July 19, 2010: 2010 Interim Final Rules, 75 Fed. Reg. 41726**

The CASC Mandate began with Interim Final Rules issued on July 19, 2010. In these rules, HHS charged the Health Resources and Services Administration (HRSA), an agency within HHS, with developing the Guidelines authorized by the Women's Health Amendment to the Affordable Care Act, 42 U.S.C. § 2713(a)(4). *See* VC ¶¶ 155-58.

**2.      August 1, 2011: IOM Report; HRSA creates CASC Mandate via website; 2011 Interim Final Rules, 76 Fed. Reg. 46621**

In response to the July 2010 IFR, the Institute of Medicine ("IOM") issued a report on July 19, 2011. The IOM Report recommended that the Guidelines cover the full range of Food and Drug Administration ("FDA")-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. *See* VC ¶¶ 159-67. HHS later acknowledged that "[b]ecause FDA includes in the category of "contraceptives" certain drugs and devices that may not only prevent conception (fertilization), but may also prevent implantation of an embryo, the IOM's recommendation included several contraceptive methods that many persons and organizations believe are abortifacient." 82 Fed. Reg. 47794-95. *See also* VC ¶ 173.

On August 1, 2011, HRSA created the CASC Mandate by publishing a website that adopted the IOM's recommendation. *See* VC ¶¶ 169-72. The same day, the Departments promulgated interim final rules related to the mandate. These rules included one of the narrowest religious exemptions ever. The "religious employer" exemption was only available to employers that met all of these criteria:

EXHIBIT A

a.      Have the inculcation of religious values as its purpose;
b.      primarily employ persons who shared its religious tenets;
c.      primarily serve persons who shared its religious tenets; and
d.      was a nonprofit organization, as described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code.

Those relevant sections of the Code include only churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of a religious order. *See* VC ¶¶ 174-84. As Sister Mary Ann Walsh with the USSCB noted, "Jesus himself couldn't pass muster" under this stingy exemption.[24]

## 3.      Feb. 10, 2012: HHS announces "Safe Harbor"; 2012 Final Rules, 77 Fed. Reg. 8725

In a January 20, 2012, press release, Secretary of HHS, Kathleen Sebelius, acknowledged the "important concerns some have raised about religious liberty" related to the CASC Mandate.[25] But a few weeks later, on February 10, 2012, the Departments ignored pleas from religious employers and finalized their narrow "religious employer" exemption without change. *See* VC ¶¶ 185-87.  They then announced a one-year "safe harbor" from enforcement of the  mandate open to religious nonprofit organizations excluded from the exemption.

The Departments stated that, during the temporary safe harbor, the Departments would engage in more rulemaking that would "accommodat[e] non-exempted, nonprofit

---

[24] Jesus Won't Pass Muster at HHS, Posting of Sr. Mary Ann Walsh to USCCBlog, http://usccbmedia.blogspot.com/2011/09/jesus-wont-pass-muster-at-hhs.html (Sept. 12, 2011) (citing the parable of the Good Samaritan, Luke 10:25-37).
[25] HHS, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, https://web.archive.org/web/20120122183016/http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

EXHIBIT A

organizations' religious objections to covering contraceptive services" while preserving access to such services. *See* VC ¶¶ 188-91.

**4.     March 21, 2012: 2012 ANPRM, 77 Fed. Reg. 16501**

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that admitted that their original "religious employer" exemption was too narrow. It described possible approaches to balance religious liberty and the Departments' interests in contraceptive access and solicited public comments. The ANPRM promised to create some kind of "accommodation" for religious employers that would still be excluded from an expanded "religious employer" exemption.

**5.     August 15, 2012: HHS modifies "Safe Harbor"**

In court, the Departments used the safe harbor to try to moot out challenges to their mandate and buy time to further insulate their mandate against religious liberty challenges. In August 2012, Wheaton College explained to counsel for the Departments that they did not qualify for the safe harbor. Days later, on August 15, 2012, HHS issued a "Revised Guidance" that modified their Safe Harbor to match Wheaton College's circumstances and therefore support their motion to dismiss Wheaton College's lawsuit.[26]

**6.     Feb. 6, 2013: 2013 NPRM, 78 Fed. Reg. 8456**

On February 6, 2013, the Departments followed up their March 2012 ANPRM with a Notice of Proposed Rulemaking (NPRM) that proposed two changes to the mandate. First, they retreated from their original religious exemption definition, stating that they

---

[26] HHS, Technical Guidance for Non-Federal Governmental Plans (Aug. 17, 2012), https://www.cms.gov/CCIIO/Resources/Files/Downloads/csg-nfgp-appeals-guidance-08-17-2012.pdf.

EXHIBIT A

would drop the requirements that a religious employer (1) inculcate religious values as its purpose, (2) primarily employ persons who share its beliefs, and (3) primarily serve persons who share its beliefs. The new "religious employer" exemption would still exclude religious nonprofits that were not churches or religious orders and all religious for-profits.

The 2013 NPRM justified this disparate treatment by claiming, without citing a supporting source, that employees of religious colleges and nonprofits "may be less likely than" employees of exempt houses of worship and integrated auxiliaries to share their employer's faith and opposition to contraception on religious grounds.

For religious groups that did not qualify for the government's exemption, the Departments proposed an "accommodation" and described how this mechanism would work in relation to insured and self-insured group health plans.

**7.    June 20, 2013: HHS modifies "Safe Harbor" again**

On June 20, 2013, the Departments modified the safe harbor again, extending it for six more months to plan years on or after August 1, 2013 and before January 1, 2014.[27]

**8.    July 2, 2013: July 2013 Final Rules, 78 Fed. Reg. 39,869**

On July 2, 2013, the Departments finalized their "accommodation" without change, rejecting comments from religious employers seeking religious liberty protection.

This regulation stated that, based on the Departments' baseless presumption that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage

---

[27] HHS, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (June 28, 2013), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.

EXHIBIT A

on religious grounds are more likely than other employers to employ people of the same faith who share the same objection" to contraceptives, exempting those organizations "does not undermine the governmental interests furthered by the contraceptive coverage requirement." 78 Fed Reg. 39,874. The Departments asserted that this policy analysis did not apply to other religious employers, even if they required all of their employees to share the employer's faith and follow a code of conduct.

9.      **Aug. 27, 2014: August 2014 Interim Final Rules, 79 Fed. Reg. 51,092**

On August 27, 2014, the Departments issued two sets of rules, adjusting the mandate in response to two Supreme Court actions. The August 2014 interim final rules, changed the accommodation process in response to the Supreme Court's July 2014 *Wheaton College* order, creating the "augmented accommodation."

10.     **Aug. 27, 2014: 2013 Proposed Rules, 79 Fed. Reg. 51,118**

In response to the Supreme Court's *Hobby Lobby* decision, the Departments issued the August 2014 proposed rules, which extended the accommodation process to closely held for-profit entities with religious objections to contraceptive coverage.  This rule effectively negated Hobby Lobby's victory in the Supreme Court.

11.     **October 2014: Department of Labor begins ordering service providers to provide CASC services in objecting religious employers' plans**

In October 2014, the Department of Labor illegally claimed the authority to unilaterally amend Wheaton College's group health plan. It wrote to Wheaton College's TPA and ordered it to begin providing abortifacients under the college's health plan, despite the college's objection, despite its lawsuit against the mandate, and despite language prohibiting such coverage in the college's plan. *See* 82 Fed. Reg. at 47,498;

EXHIBIT A

Statement of Wheaton College, *Wheaton College v. Burwell*, No. 14-2396 (7th Cir. Jan. 12, 2015) (describing Departments' communications to Wheaton's TPA and why these communications caused Wheaton "direct harm[]").

## 12.    July 15, 2015: July 2015 Final Rules, 80 Fed. Reg. 41,318

On July 14, 2015, the Departments issued a new set of rules that finalized both the August 2014 interim final rules and the August 2014 proposed rules (the July 2015 Final Rules, 80 Fed. Reg. 41,318).

The Departments also used these rules to bolster their attempts to defeat legal challenges to their mandate. First, the Departments used the rules to announce a new compelling government interest. Here, for the first time, they asserted a compelling government interest in providing "seamless" access to CASC services. *Id.* at 41,328.

Second, they claimed that their new augmented accommodation, under which objecting religious employers had to submit a notice to DOL, "represents the minimum information necessary for us to administer the accommodation process." *Id*. at 31,323.

## 13.    May 16, 2016: Departments began using *Zubik* order as authority to coerce TPAs into covering CASC services

At various times after the Supreme Court's remand order in *Zubik*, HHS and DOL sent letters to the issuers and third party administrators of certain plaintiffs in *Zubik* and other cases, directing the issuers and TPAs to provide CASC coverage for participants in plaintiffs' group health plans under the accommodation. They filed their first motion for a so-called "*Zubik* order" in the CBA's case on May 16, 2016. *See supra* § V(G)(1).

**14.**     **July 26, 2016: Request for Information, 81 Fed. Reg. 47,741**

The Departments issued a Request for Information (RFI) on July 26, 2016, seeking public comment on options for modifying the accommodation process in light of the supplemental briefing in *Zubik* and the Supreme Court's remand order. 81 Fed. Reg. 47,741. Over 54,000 public comments were submitted in response to the RFI before the comment period closed on September 20, 2016. *See supra* § V(G)(2).

**15.**     **Dec 20, 2016: HRSA expands CASC mandate**

On December 20, 2016, HRSA expanded its CASC Mandate by updated the Guidelines via its Web site: HRSA, Women's Preventive Services Guidline, https://www.hrsa.gov/womensguidelines2016/index.html. HRSA announced that the updated Guidelines would apply to the first plan year beginning after December 20, 2017. Among other changes, the updated Guidelines specified that the required contraceptive coverage includes follow-up care including management, evaluation, revision, removal, or discontinuation of the contraceptive method.

**16.**     **January 9, 2017: FAQs About Affordable Care Act**

In January 2017, the Departments concluded the RFI process through an FAQ stating that they decided to maintain the accommodation without change.[28] *See supra* § V(G)(2).

---

[28] Dept. of Labor, FAQs About Affordable Care Act Implementation Part 36, Jan. 9, 2017, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

EXHIBIT A

17.   **May 4, 2017: Presidential Executive Order Promoting Free Speech and Religious Liberty**

On May 4, 2017, President Trump issued an Executive Order instructing the Departments to "consider issuing amended regulations . . . to address conscience-based objections" to the challenged mandate.[29] That same day, Secretary of HHS, Thomas Price, stated: "We welcome today's executive order . . . and will be taking action in short order to follow the President's instruction to safeguard the deeply held religious beliefs of Americans who provide health insurance to their employees."[30] *See surpa* § V(H)(1).

18.   **October 6, 2017: October 2017 Interim Final Rules**

On October 6, 2017, the Departments issued new Interim Final Rules where they admitted that the CASC Mandate and its accommodation violates every prong of the RFRA test as applied to religious employers like CBA members. As a result, they expanded the "religious employer" exemption to include "all bona fide religious objectors." *See supra* § V(H)(2)2; ECF No. 161 at 10-13.

---

[29] Exec. Order, No. 13798, 82 Fed. Reg. 21675 (May 4, 2017).
[30] Press Release, U.S. Dep't of Health & Human Services, Secretary Price Welcomes Opportunity to Reexamine Contraception Mandate (May 7, 2017), available at https://www.hhs.gov/about/news/2017/05/04/secretary-price-welcomes-opportunityto-reexamine-contraception-mandate.html.

## Appendix III: Nussbaum Resume

### *L. MARTIN NUSSBAUM*

**PRACTICE AREAS**
Mr. Nussbaum's practice consists of advising and advocating for religious institutions of all types in board rooms and ecclesiastical settings and before courts and administrative tribunals across the country at all levels.  His advocacy routinely includes First Amendment and other constitutional protections as well as a host of laws providing special treatment for religious organizations.

**BAR AND COURT ADMISSIONS**
Mr. Nussbaum is admitted in Colorado state, federal, and bankruptcy courts, the Tenth Circuit, the United States Supreme Court and, by pro hac vice admission, in state supreme courts and United States District Courts and Courts of Appeals across the country.

**EDUCATION**
University of Texas School of Law, J.D. 1985
Baker & Botts Prize (Outstanding Second-Year Student)
Dean's Award for Academic Distinction
Weaver Fellow

University of Notre Dame, B.A. 1974
*Phi Beta Kappa*
Cavanaugh Award (Outstanding Senior in Theology Department)
*Summa cum laude*
Notre Dame Scholar

**NOTABLE CASES AND REPRESENTATIONS**
Knights of Columbus & In Defense of Christians:  Christian Genocide Project (counsel of record for legal brief and 277 page report, GENOCIDE AGAINST CHRISTIANS IN THE MIDDLE EAST (March 9, 2016) causing to Secretary of State John Kerry to issue genocide declaration for religious groups, including Christians, in ISIS-controlled territories).

Chabad-Lubavitch of Michigan v. Schuchman, 853 N.W.2d 390 (Mich. Ct. App. 2014) (First Amendment Doctrine of Church autonomy requires equitable tolling during exhaustion of ecclesiastical remedies including thirteen years of litigation before three rabbinic panels), *rev'd*, 862 N.W.2d 648 (Mich. 2015), *cert. denied* (U.S. 2016).

Lindeman v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints, 43 F.Supp. 2d 1197 (D. Colo. 2014) (summary judgment for church in situation where Sunday School teacher had intercourse with 15-year old girl, holding that there is no fiduciary relationship between Sunday School teacher and visiting student, there is no legal

EXHIBIT A

duty for church to hire or to supervise with concern as to teachers after hours, off premises misconduct).

Dobson v. Sebelius, 38 F.Supp.3d 1245 (D.Colo. 2014) (preliminary injunction granted because Religious Freedom Restoration Act requires exemption for the benefit of Dr. James Dobson and his ministry, Family Talk, from HHS abortifacient mandate).

Purdum v. Purdum, 301 P.3d 718 (Kan. App. 2013) (First Amendment Establishment Clause and related Doctrine of Church Autonomy deprive court of subject matter jurisdiction to adjudicate wife's allegedly defamatory statement made before archdiocesan tribunal in annulment case).

Spencer v. World Vision, 633 F.3d 723 (2010) (*per curiam*)  (Title VII religious organization exemption applies to international Christian aid agency so that it may lawfully terminate atheist employees) (amicus advocacy on behalf of Christian Legal Society, National Association of Evangelicals, and Union of Orthodox Jewish Congregations of America).

Grace Church & St. Stephen's v. Bishop and Diocese of Colorado, Case No. 07CV1971 (El Paso County Dist. Ct., Colorado 2009) (successful lead counsel for Episcopal Church parish and Diocese of Colorado in five week trial in a secessionist congregation dispute).

Colorado Christian University v. Weaver, 534 F.3d 1245 (10th Cir. 2008) (First Amendment advocacy successfully challenging constitutionality of statute deprivi students of public financial assistance if they attended a "pervasively sectarian" institution).

In Roman Catholic Archbishop of Portland in Oregon, and Successors, a Corporation Sole, dba Archdiocese of Portland in Oregon, 345 B.R. 230 (Bankr. D. Or. 2006) (archdiocesan self-settled trust corpus is not part of debtor's estate; debtor's beneficial interest in trust is part of the estate but is subject to conditions on use of income in declaration of trust).

In Roman Catholic Archbishop of Portland in Oregon, and Successors, a Corporation Sole, dba Archdiocese of Portland in Oregon 335 B.R. 815 (Bankr. D. Or. 2005), 335 B.R. 868 (Bankr. D. Or. 2005), 345 B.R. 686 (Bankr. D. Or. 2006) (First Amendment and charitable trust counsel for the Archdiocese of Portland in the first bankruptcy of Catholic diocese in American history).

Colorado v. Sue, (Case Number: 2000CR37, Park County District Court, Colorado 2002) (In triple murder case, District Court, applying First Amendment Doctrine of Church Autonomy to protect church communications; quashes subpoena duces tecum served on Lutheran pastor.)

<u>Hiles v. Episcopal Diocese of Massachusetts</u>, 437 Mass. 505, 773 N.E.2d 929 (Mass. 2002)  (First Amendment Doctrine of Church Autonomy bars civil court jurisdiction over defamation, civil rights, and other claims brought by Episcopal priest and his wife and arising from a church disciplinary process).

<u>Steele v. Industrial Development Board of the Metropolitan Government of Nashville and Davidson County</u>, 301 F.3d 401 (6th Cir. 2002) (Establishment Clause does not preclude local government from providing tax exempt bond financing for Lipscomb University, a Church of Christ college) (amicus advocacy)<u>.</u>

<u>Bryce v. Episcopal Church in the Diocese of Colorado</u>, 289 F.3d 648 (10th Cir. 2002) (affirming dismissal of Title VII and 42 U.S.C. § 1983 claims of youth minister and her partner because First Amendment Religion Clauses' Doctrine of Church Autonomy deprives civil courts of jurisdiction to hear such claims).

<u>Williams v. Episcopal Diocese of Massachusetts</u>, 436 Mass. 574, 766 N.E.2d 820 (2002) ( Episcopal priest's civil rights claims alleging gender discrimination, harassment, and retaliation barred First Amendment Religion Clauses).

<u>McClellan v. Colorado Department of Corrections</u> (D. Colo. 1993) (allowing an Episcopal inmate access to the eucharistic cup during Sunday services notwithstanding a Department of Corrections rule against drinking alcoholic beverages; case subsequently cited in Senate debate over the passage of the Religious Freedom Restoration Act).

## **SELECTED PUBLICATIONS**

"'Error Has No Rights': Religious Coercion Persists, from Russia to America," National Review (September 18, 2017) (with John N. Thorpe).

"The Unconstitutional Blaine Amendment in Colorado and Beyond," (paper) presented to the Colorado Advisory Committee of the U.S. Commission on Civil Rights (University of Denver, July 19, 2017).

"Little Sisters, Big Stakes," National Review (March 21, 2016).

"Call ISIL's religious war what it is: Genocide," Politico (March 16, 2016).

"The HHS Mandate:  Why has the administration picked a fight it is almost sure to lose?" National Review Online (August 21, 2012).

"'The American River Ganges' Rising," First Things (website) (December 10, 2010) (with Melissa Nussbaum).

**SELECT PRESENTATIONS**
"Catholic Moral Issues Related to Coverage and Services Mandates," Penrose-St. Francis Hospital Ethics Committee (November 29, 2017).

"*Dignitatis Humanae*: Religious Freedom as Understood by the Church," Catholic Bar Association (Kansas City, November 2, 2017)

"Sexuality, Self-Creating Freedom , and the Law: Challenges and Defenses for Catholic Healthcare Professionals," Catholic Medical Association Convention (Denver, September 9, 2017).

"Blaine Amendment: Colorado Constitution's No Aid Clause and Its Impact in Colorado," Colorado Advisory Committee of the U.S. Commission on Civil Rights (University of Denver, July 19, 2017) (testimony during public hearing).

"Sexuality, Self-Creating Freedom, and the Law," Courage International Truth and Love Conference (Phoenix, January 11, 2017).

"Canon Law as the Substantive Law for the United States Supreme Court, *Speculum Iustitiae* Conference (La Crosse, July 26, 2016).

**OTHER**
United States Conference of Catholic Bishops, Committee on Religious Liberty
  Consultant 2011 to present
National Diocesan Attorneys Association
  Member, 1988 to present
  Litigation Committee, 2001 to 2012
  Executive Committee, 2016 to present
Christian Legal Society
  Center for Law and Religious Freedom Litigation Committee, 1999 to 2011
Colorado Supreme Court Nominating Commission
  Commissioner, 2006 to 2011

Chambers USA, First Amendment litigation—nationwide, 2016 to present
Best Lawyers in America (Non-Profit/Charities Law), 2007 to present
2014 Denver Lawyer of the Year in Non-Profit & Charities Law
BTI Client Services All Star, 2014 (for outstanding client services to a Fortune 1000 company)
Colorado Super Lawyer (constitutional law), 2006 to present
Martindale Hubbell (AV preeminent rating), 1994 to present

## Appendix IV: Kniffin Resume

### *ERIC N. KNIFFIN*

## LAW PRACTICE

**LEWIS ROCA ROTHGERBER LLP,** OF COUNSEL (2014 - present)
- Representing religious institutions address a wide range of matters, including employment, land use, property tax, human relations, workers compensation, and health care issues
- Advising religious employers and schools on religious liberty matters

**THE BECKET FUND FOR RELIGIOUS LIBERTY,** LEGAL COUNSEL(2009 - 2013)
- Represented clients in high-profile religious liberty cases in trial and appellate courts, including nationwide litigation challenging HHS Mandate

**UNITED STATES DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION** (2005 - 2009)
**HOUSING & CIVIL ENF. SECTION/SPECIAL LIT. SECTION,** TRIAL ATTORNEY
- Conducted investigations and litigation to enforce the Fair Housing Act and RLUIPA and to address systemic violations of civil rights in jails, prisons, and juvenile facilities.

## COURT ADMISSIONS

Illinois, Washington D.C., Colorado, U.S. Supreme Court, Various federal appellate and district courts.

## EDUCATION

**UNIVERSITY OF NOTRE DAME LAW SCHOOL,** J.D., *cum laude* (2003)
Dean's List; Dean's Award; Christian Legal Society, President, 2002-2003;
*Notre Dame J. of Law, Ethics & Public Policy,* Solicitation Editor, Symposium Chair

**GORDON-CONWELL THEOLOGICAL SEMINARY,** M.A., Theology, *cum laude* (2000)
Teaching Assistant, Philosophy, Gordon College
Additional coursework at Harvard University

**WHEATON COLLEGE (IL),** B.A., Philosophy, *cum laude* (1998)
Dean's list; Varsity Baseball; Dorm President;
Vice-President, *Omicron Delta Epsilon,* Int'l Honor Society in Economics

## SIGNIFICANT LITIGATION

*Hosanna-Tabor v. E.E.O.C.*, 132 S. Ct. 694 (2012) (Ministerial Exception)
*Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172 (W.D. Wash. 2012); __ F.3d __ (9th Cir. Nos. 12-35-221 & 12-35223) (First Amendment Free Exercise Clause)
*Jenks v. Spry*, 292 P.3d 19 (Okla. 2013) (Blaine Amendments, private school scholarships)

EXHIBIT A

*Moss, Freedom From Religion Foundation v. Spartanburg Cty. Sch. Dist. No. 7*, 683 F.3d 599 (4th Cir. 2012) (First Amendment Establishment Clause, public schools)
*Kimery v. Broken Arrow Public Schools*, No. 11-CV-249 (N.D. Okla. 2011);
*Belmont Abbey College v. EEOC* (Title VII, contraception coverage)
*Yoder v. Morristown*, No. 7:09-cv-7 (N.D.N.Y. 2009) (RLUIPA, housing code)
*United States v. Donald Sterling, et al.,* 2:06-cv-48805 (C.D. Cal. 2006) (Fair Housing Act).

## SELECTED PUBLICATIONS

Eric Kniffin, *The threadbare case against Little Sisters of the Poor: The administration's argument misrepresents Congress' intent*, Washington Times, May 10, 2016, http://www.washingtontimes.com/news/2016/may/10/eric-kniffin-the-case-against-little-sisters-of-th/

Eric Kniffin, *Protecting Your Right to Serve: How Religious Ministries Can Meet New Challenges without Changing Their Witness*, The Heritage Foundation, Nov. 9, 2015, http://www.heritage.org/civil-society/report/protecting-your-right-serve-how-religious-ministries-can-meet-new-challenges.

Martin Nussbaum and Eric Kniffin, *Obama's Executive Order Tramples Values of Faith-Based Agencies*, National Catholic Register, July 28, 2014, http://www.ncregister.com/daily-news/obamas-executive-order-tramples-values-of-faith-based-agencies/.

Eric Kniffin, *Are American Muslims Entitled to the Same Free Exercise Rights as Other Americans?,* The Huffington Post, May 26, 2011, http://www.huffington post.com/eric-n-kniffin/are-american-muslims-enti_b_867777.html.

## SELECTED PRESENTATIONS

"The *Bible* in the Public Schools," First Freedom Center, Richmond, VA   (6 March 2011).
"Religious Liberty and the HHS Mandate," Center for Applied Christian Ethics, Wheaton College (IL) (29 Oct. 2012).
"How *the* Law Defines Religious Liberty in Public Schools," Religious Freedom Institute, Colorado Springs, CO (11 April 2015).
"Engaging Cultural Questions about Sexual Identity: Theological, Relational, and Practical Issues for Churches and Ministries," Institute of Theology and Public Life, Reformed Theological Seminary, McLean, VA (June 6, 2015) .
"Religious liberty after Obergefell: Same-sex marriage and Catholic employers," Regional Meeting of National Diocesan Attorneys Association, Oklahoma City, OK (Oct. 10, 2015).
"Protecting the Freedom to Serve: Faith-Based Ministry Preparedness for New Cultural Challenges," 2015 Antipoverty Forum, The Heritage Foundation, Washington, DC (Nov. 19, 2015).
"Mission Audit Overview for Christian Universities," Alliance of Assemblies of God Higher Education, Springfield, MO (June 20, 2016) .
Panelist, "Strategies & Solutions Workshop: Addressing the Crisis in Middle America," The Heritage Foundation Resource Bank, Broadmoor, May 10, 2017.

EXHIBIT A

## OTHER RELEVANT EXPERIENCE
**QUOTED OR APPEARED IN:** Wall Street Journal, USA Today, Washington Times, The Weekly Standard, NPR, World Magazine, National Catholic Register, Health Day, National Review, Crux, Wheaton College Alumni Magazine, Colorado Springs Business Journal, and Law Week Colorado

**LAW CLERK, UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA**
    Hon. Theresa L. Springmann, Fort Wayne, IN (2003-2005).

EXHIBIT A

## Appendix V: Mahaffey Resume

### *H. WILLIAM MAHAFFEY*

Mr. Mahaffey's practice emphasis is in the taxation, exempt organizations, finance, corporate, and transactional areas. He has provided counsel on a wide range of tax sensitive matters.

### PRACTICE AREAS

| | |
|---|---|
| Taxation | Executive Compensation |
| Exempt Organizations | Trusts & Estates |
| Employee Benefits | International Business Services |
| Health Care Services | Real Estate Finance & Lending |
| ERISA | |

### BAR ADMISSIONS
Colorado, 1982

### COURT ADMISSIONS
Colorado Court of Appeals
Colorado State Judicial District Courts
Colorado Supreme Court
U.S. Circuit Court of Appeals, 10th District
U.S. District Court, Colorado
U.S. Tax Court

### EDUCATION AND ACADEMIC HONORS
LL.M., New York University School of Law, 1981
J.D., Brigham Young University, J. Reuben Clark Law School, 1980, with honors
B.A., Colorado State University, 1977

### REPRESENTATIVE CASES AND MATTERS
Health plan design, including self-funded health plans
Nonprofit organizations, including initial exemption determinations, joint ventures with for-profit organizations, unrelated business income, and various operations and employee benefit matters.
Compensation and fringe benefit matters, including qualified and nonqualified options, self-funded welfare benefit plans, and related matters
Mergers, acquisitions (taxable and tax-deferred), and reorganizations
Banking regulatory and finance issues, including financial accounting aspects associated with financial institution regulatory capitalization requirements
Corporate taxation, partnerships, and limited liability companies, including formation and operational issues

EXHIBIT A

ERISA-related matters, including leveraged and nonleveraged ESOPs, qualified plans and advice to plan sponsors concerning fiduciary and plan administration issues
Estate and gift taxation planning
Assists in litigation in the Federal Tax Court and employee benefits litigation brought or maintained by plan participants or beneficiaries

## ARTICLES
Co-Author, "IRS Announcement on February 9, 2015, Requires Review of Charter Schools Tax Status," 02/23/2015
Co-Author, "Increased IRS Scrutiny of Charter Schools Operated by For-Profit Management Companies," *Rothgerber, Johnson & Lyons Client Alert*, 06/18/2012
Co-Author, " Morally Compliant Medical Benefits for Ministries," *Lewis Roca Rothgerber Christie*, 03/14/2012
Co-Author, "Tax Consequences of Defaulted Loans," *Rothgerber, Johnson & Lyons Client Alert*, 04/26/2011
Author, "Big Changes for Health Care Continuation Coverage," *RJ&L Employment Law Update*, April 2009
Author, "IRS Guidance Published: Reimbursement for Employers for Advancing COBRA Premiums," *RJ&L Alert*, March 2009
Author, "Restoring PERA Contributions by Returning Employees," *RJ&L Employment Law Update*, June 2007

## HONORS AND AWARDS
Chambers USA - Corporate/M&A, 2016
The Best Lawyers in America - Tax Law, 2016-2018

EXHIBIT A

## Appendix VI: Speir Resume

### *IAN SPEIR*

**PRACTICE AREAS**
  Religious institutions and litigation, with focus on First Amendment (religion, speech, and association), general commercial and civil litigation, and outside general counsel work for churches, ministries, and other nonprofit organizations.

**BAR AND COURT ADMISSIONS**
  **State bar**: Colorado (2013-present)

  **Court admissions**: U.S. Supreme Court, U.S. Court of Appeals for the Tenth Circuit, U.S. District Courts (Colorado, North Dakota), U.S. Court of Federal Claims.

**EDUCATION**
  **Georgetown University Law Center**, Washington, D.C.
  J.D., 2011
  *Honors*: *Magna cum laude*, Order of the Coif
  *Activities*: Executive Editor, *Georgetown Law Journal*

  **Texas A&M University**, College Station, TX
  M.A., International Affairs, 2007 (emphasis in international economics)
  *Honors*: *Cum laude*, Robert M. Gates/Heep Endowed Fellow
  *Activities*:Associate Editor, *Atlantic Affairs Journal*

  **Oral Roberts University**, Tulsa, OK
  B.S., Mathematics, 2005 (minor in Spanish)
  *Honors*: *Summa cum laude*, departmental honors

**SELECT LITIGATED CASES**
  **First Amendment**: *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (amicus, trial, and appellate counsel in numerous religious freedom cases challenging federal healthcare mandates); *Weise v. City of Colorado Springs* (D. Colo., *pending*) (free speech); *LiST Interactive, Ltd. v. Knights of Columbus* (D. Colo., *pending*) (religious freedom, freedom of association); *Roman Catholic Archdiocese of Kansas City v. City of Mission Woods* (D. Kan., *pending*) (religious freedom); *Chabad-Lubavitch of Michigan v. Schuchman*, 853 N.W.2d 390 (Mich. App. 2014) (religious freedom).

  **Other civil**: *David v. Sirius Computer Solutions*, 779 F.3d 1209 (10th Cir. 2015) (Gorsuch, J.) (briefs and oral argument in commercial dispute); *Nickerson v. Network Solutions, LLC,* 339 P.3d 526 (Colo. 2014) (briefs to Colorado Supreme Court in contract dispute); *Aspen Mortg. Corp. v. Fountain Vill. Townhomes Lender, LLC* (Colo. App. 2014) (briefs and oral argument in real estate dispute); *Allonhill, LLC v. Aurora Commercial Corp.* (Colo. 2017) (appellate and cert briefs in contract dispute); *Chromatic Techs., Inc. v. SilverFox Innovations, LLC* (Colo. Dist. Ct. 2015) (2-week jury trial in trade secret dispute).

## SELECT PUBLICATIONS AND PRESENTATIONS

"'A Beacon on our Coast': Religious Freedom as the First Freedom at Home and Abroad," *Providence*, forthcoming Spring 2018, http://ssrn.com/abstract_id=3064709.

"Promotion Religious Freedom Abroad," speech and panel presentation at J. Reuben Clark Law Society Annual Conference, Feb. 16, 2018, University of Utah, Salt Lake City.

"Confident Pluralism: Surviving and Thriving Through Deep Difference," Sep. 29, 2017, Colorado Springs. Moderator for John Inazu (Wash. U. in St. Louis) on First Amendment, religious freedom.

"'A Beacon on our Coast': Religious Freedom as the First Freedom at Home and Abroad," speech and panel presentation for "International Religious Liberty and Human Rights in the Trump Administration" (Institute on Religion and Democracy), Apr. 19, 2017, Nat'l Press Club, Wash., D.C.

"The Calvinist Roots of American Social Order: Calvin, Witherspoon, and Madison," *Public Discourse*, Apr. 13, 2017, http://www.thepublicdiscourse.com/2017/04/19116/.

"We Must Prioritize the Persecuted," *Providence*, Feb. 1, 2017, https://providencemag.com/2017/02/we-must-prioritize-persecuted/.

"How the Trump Administration Can Support Christians in the Middle East," *Providence*, Jan. 6, 2017, https://providencemag.com/2017/01/trump-administration-can-support-middle-east-christians/.

"ISIS, the Secretary, and Genocide," *Your Weekly Constitutional* (Podcast from PRX and James Madison's Montpelier), Oct. 2, 2016.

"Remembering Those Who Suffer," *Ethika Politika*, June 1, 2016, https://ethikapolitika.org/2016/06/01/remembering-those-who-suffer.

"Genocide Against Christians in the Middle East," Mar. 9, 2016 (with R. Destro & L.M. Nussbaum): comprehensive report and atrocities database submitted to U.S. State Department, http://www.stopthechristiangenocide.org/scg/en/resources/Genocide-report.pdf.

*Preservation Rules in the Federal Courts of Appeals*, 16 J. APP. PRAC. & PROCESS 281 (2015).

*Corporations, the Original Understanding, and the Problem of Power*, 10 GEO. J.L. & PUB. POL'Y 115 (2012).

Note, *Pulling Back the Covers:* Saleh v. Titan Corporation *and (Near-) Blanket Immunity for Military Contractors in War Zones*, 1 U. MIAMI NAT'L SEC. & ARMED CONFLICT L. REV. 100 (2011).

*African Capacity Building for Meat Exports: Lessons from the Namibian and Botswanan Beef Industries*, 19-WTR CURRENTS: INT'L TRADE L.J. 55 (2010) (with R. Cabrera et al.).

EXHIBIT A

*Microfinance and the Knowledge Paradigm: Overcoming Barriers*, 18 LBJ J. PUB. AFFAIRS 7 (2007).

## OTHER RELEVANT EXPERIENCE

**Senior Advisor for Human Rights**
In Defense of Christians, Washington, D.C. (February 2018-present)

**Lecturer**
University of Colorado at Colorado Springs (Aug. 2017-present)
➤ Teach Constitutional Law (PSC 4470) and The First Amendment (PSC 4980).

**Contributor and Editorial Advisor**
*Providence*, Washington, D.C. (Jan. 2017-present)
➤ Essays and editorial advice for journal of American foreign policy and Christian ethics.

**Law Clerk, U.S. Court of Appeals for the Tenth Circuit**
Hon. Jerome A. Holmes, Oklahoma City, OK (Aug. 2011-Sep. 2012)

**International Tax Economist**
Mayer Brown LLP, Washington, D.C. (July 2007-July 2011)
➤ Analysis and valuation of international tax transactions in support of firm's tax practice.

EXHIBIT A